PIPER and others, Appellants, vs. EKERN, as Attorney General, Respondent.

*May 7—May 25, 1923.*

*Constitutional law: Eminent domain: Necessity of taking: Reasonable compensation: Legislation limiting height of buildings surrounding state capitol: Validity.*

1. When private property is taken under the power of eminent domain, it must first be established that the taking is necessary for a public use, and the reasonable value must be duly established and paid.

2. All private property is held subject to a reasonable exercise of the police power, which is based on an implied restriction pursuant to which property rights may be regulated and diminished in value for the benefit of the general public or a certain portion of the public in a specified area.

3. The state in the exercise of the police power may impose regulations which limit the height of buildings to be erected in cities when such regulation is reasonably necessary for the protection of the public health, safety, or welfare.

4. The owner's right in property, when unrestricted, extends not only downward under the surface to an unlimited extent but also upward.

5. As the value of business property in the business district of a city consists in the right to use it for business purposes, any unreasonable police regulation restricting such right amounts in substance to a taking for public use without compensation.

6. Sec. 4444g, Stats. 1921, limiting the height of buildings on property surrounding the State Capitol building for the purpose of preventing damage to that building and the property therein from fire, constitutes an unreasonable exercise of the police power and an attempt to acquire rights that can only be acquired by exercising the power of eminent domain, and violates sec. 13, art. I, Const., prohibiting the taking of property for public use without just compensation, and also the due-process clause of the Fourteenth amendment to the federal constitution.

CROWNHART, J., dissents.

APPEAL from an order of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

For the appellants there was a brief by *Hall, Baker & Hall* of Madison, and oral argument by *John F. Baker* and *Frank W. Hall.*

For the respondent there was a brief by the *Attorney General* and *Wm. R. Curkeet,* deputy attorney general, and oral argument by *Mr. Curkeet.*

The following decision was announced May 25, 1923:

PER CURIAM. It is held that sec. 4444g, Stats. 1921, prohibiting the erection around the Capitol Square of buildings exceeding ninety feet in height, is unconstitutional because it is not a valid exercise of the police power of the state; and if considered as the exercise of the power of eminent domain it is void because it does not provide for compensation.

An injunction as prayed for in the complaint will issue. An opinion will be filed later.

JONES, J., took no part.

The following opinions were filed June 18, 1923:

The appeal is from an order overruling the general demurrer of the plaintiffs to defendant's answer.

The material allegations of the complaint, in substance, are as follows: Plaintiffs are copartners and the owners of real estate situated on the corner of Pinckney and Mifflin streets in the city of Madison, having a frontage of forty-four feet on Pinckney street and extending back on Mifflin street 120 feet; that they have had plans prepared for the construction of a fire-proof hotel building 115 feet high above the curb on Pinckney street and covering said real estate, the building to be eleven stories in height; that the estimated cost of said proposed building is the sum of $350,000, and that the value of the ground, exclusive of the building, when the building shall be erected thereon, will be $150,000; that plaintiffs claim that sec. 4444$g$ of the Statutes, which limits the height of a proposed building to be erected upon the so-called Capitol Square to ninety feet above the curb, is unconstitutional, and that they intend to proceed with the erection of the building in accordance with their proposed plans notwithstanding such section, and that they have been threatened with prosecution under the provisions of said statute by the defendant acting in his official capacity; that in order to make the contemplated hotel enterprise a paying investment it is necessary to construct a building of the proposed height, and that if the building be limited to ninety feet in height a loss on the value of the real estate would be sustained in the sum of $50,000, and an annual loss in the income of the proposed hotel of $35,000; that the state of Wisconsin owns the so-called Capitol Square and the Capitol building in its proprietary capacity.   Plaintiffs ask for relief—a permanent injunction enjoining the defendant in his official capacity from attempting to enforce the provisions of said statute against them.

The defendant in his answer admits the location and

ownership of plaintiffs' property as set forth in the complaint, and the preparation of plans, but denies that the building will be of fire-proof construction, alleging that the hotel building as proposed will be built of stone, wood, concrete, iron, and brick; admits that in order to provide for 200 guest rooms as shown by the plans it would be necessary to erect a building of eleven stories 115 feet above the curb on Pinckney street; admits the estimated cost of the proposed building; that the real estate would be more valuable with the building erected as proposed than if restricted to a height of ninety feet; that a building 115 feet in height, when conducted for hotel purposes, will yield a greater financial return than one ninety feet in height; admits the ownership of the Capitol Square and the Capitol building, as is alleged in the complaint; alleges that the Capitol Square consists of about fifteen acres of land, and that the Capitol building is located in about the center of such Square, and that the government and public offices, records, etc., are contained in such building, and that such building and records are of great value; and that the property contained in said building is essential to the welfare of the public and the discharge by the state of its governmental functions; that the Capitol building is constructed of stone, wood, steel, and other modern building material, but that the property contained therein is readily subject to destruction by fire; that to erect the building in accordance with the proposed plans would materially increase the danger and hazard to the Capitol building and the contents thereof from fire; that the distance between said Capitol building and the plaintiffs' premises is 387 feet; that the plaintiffs have expressed their intention to proceed with the construction of said hotel building in accordance with the proposed plans; and that the defendant has threatened to enforce the provisions of sec. 4444g of the Statutes.

Plaintiffs thereupon entered a general demurrer to the answer of the defendant, which demurrer the circuit court

overruled, and from the order overruling said demurrer plaintiffs have taken this appeal. Additional facts are set forth in the opinion.

DOERFLER, J.    We will first consider the attack made by the plaintiffs upon said section as being an unlawful taking of private property for a public purpose, in violation of the due-process clause of the Fourteenth amendment of the federal constitution, and the provisions of sec. 13, art. I, of the state constitution, which provides: "The property of no person shall be taken for public use without just compensation therefor."    The statute in question reads as follows:

"Section 4444g.    1. For the purpose of preventing damage to the state capitol building and state property therein because of fire hazard, no building or structure hereafter erected in the blocks, or any part thereof, surrounding state property included in the capitol park in the city of Madison, namely, blocks seventy-two, seventy-three, seventy-four, seventy-five, seventy-six, seventy-seven, eighty-three, eighty-four, eighty-nine, ninety, ninety-nine, one hundred, one hundred one, one hundred two, one hundred three or one hundred four shall exceed ninety feet in height, and exclusive of chimneys and elevator houses erected thereon, measuring from the highest point of the curb line immediately in front of any lot or lots upon which such building or structure is erected; and no building now erected or in process of erection in any such block or any part thereof shall be altered or reconstructed so that the same when completed will exceed ninety feet in height when measured as above provided.

"2. Any person, firm or corporation who shall cause, allow or permit any building or structure to be erected, altered or reconstructed in violation of the provisions of this section shall forfeit the sum of twenty-five dollars for each day such violation continues.

"3. The attorney general shall enforce the provisions of this section and shall institute proper proceedings to restrain violations thereof."

Piper v. Ekern, 180 Wis. 586.

Private property taken for a public purpose under the power of eminent domain is transferred to the public or to a public agency upon the payment of its reasonable ascertained value, and when private property is taken under such power it must first be established that the taking is necessary for a public use; and second, the reasonable value must be duly established and paid.  All private property is held subject to a reasonable exercise of the police power of the state, which is based on an implied restriction pursuant to which property rights may be regulated and diminished in value for the benefit of either the general public or of a certain portion of the public in a specified area.  It has there-. fore been held, and it appears now to be firmly established, that the state may, in the exercise of the police power, impose regulations which limit the height of buildings to be erected in cities where such regulation is reasonably necessary for the protection of the public health, the public safety, or the public welfare.  *Welch v. Swasey,* 214 U. S. 91, 29 Sup. Ct. 567; *Cochran v. Preston,* 108 Md. 220, 70 Atl. 113; 4 Ruling Case Law, 398, 399; 6 Ruling Case Law, 213; 2 Tiedeman, State and Federal Control, etc. 754; *Watertown v. Mayo,* 109 Mass. 315, 319; *People ex rel. Kemp v. D'Oench,* 111 N. Y. 359, 361, 18 N. E. 862.

Such regulation affecting the owners of property in a certain area, to a large extent is. founded upon the mutual and reciprocal protection which owners of property derive from a general law, and while in a sense a material diminution in value may result, nevertheless a reciprocal advantage accrues which in many instances it is impossible to estimate from a financial standpoint, but which nevertheless constitutes a thing of value and a compensating factor for the interference by the public with property rights.

As is said in *Watertown v. Mayo,* 109 Mass. 315, 318:

"Laws passed in the legitimate exercise of this [the police] power are not obnoxious to constitutional provisions,

although in some measure interfering with private rights, merely because they do not provide compensation to the individual whose liberty is restrained. *He is presumed to be rewarded by the common benefits secured.* It differs from the right of eminent domain, which involves the appropriation of private property to public use, and requires, in its lawful exercise, pecuniary compensation for the loss inflicted on the owner. . . .

"To a great extent the legislature is the proper judge of the necessity for the exercise of this restraining power. It is not easy to prescribe its limit. The law will not allow rights of property to be invaded under the guise of a police regulation for the preservation of health or protection against a threatened nuisance; and when it appears that such is not the real object and purpose of the regulation, courts will interfere to protect the rights of the citizen. . . .

"Nor as a police regulation is it essential that its provisions shall be applicable to all parts of the commonwealth. Density of population is itself an element which may increase the danger to be provided against, and which in any locality may justify the interference of the legislature and relieve it from the objection that its action is partial and unequal. The same rule is provided for all, to be applied only where from the surrounding circumstances there is the same exposure. *Comm. v. Alger,* 7 Cush. 53; *Baker v. Boston,* 12 Pick. 184; *Coates v. New York,* 7 Cow. 585, 604." See, also, *Welch v. Swasey,* 193 Mass. 364, 79 N. E. 745.

The owner's right in property, when unrestricted, extends not only downward under the surface to an unlimited extent but also upwards, and the latter right, from common experience, would appear to be the more valuable. In large cities, in congested business areas, the value of property consists almost exclusively in the right of the owner to erect business and industrial structures thereon, and the well-defined distinction appears from the authorities that the unrestrictable right in such localities to build to a considerable height is greater than in residential districts. Such rule seems to follow from the necessity arising out of the situation. *Welch v. Swasey,* 193 Mass. 364, 79 N. E. 745.

Without such right to erect buildings to considerable height upon business areas, the ownership of property therein would become more a liability than an asset.

As is said in *Comm. v. Clearview C. Co.* 256 Pa. St. 328, 331, 100 Atl. 820, L. R. A. 1917E, 672, "For practical purposes the right to coal consists in the right to mine it." And as is said in *Pennsylvania Coal Co. v. Mahon* (U. S.) 43 Sup. Ct. 158: "What makes the right to mine coal valuable is that it can be exercised with profit. To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it."

As the value of the ownership of coal or mineral lands consists in the right to mine it, so the value of business property in a business district in a city consists in the right to use the property for business purposes, and any unreasonable police regulation restricting such right, in substance amounts to the taking of private property for a public use without compensation. True, in one sense such a restriction under the police power does not transfer property from the private owner to the public, as is the case where the power of eminent domain is exercised; nevertheless such restriction may be of such a nature as to practically accomplish the same result, and the distinction as above indicated with reference to the two methods sanctioned for the taking or restricting of the private right for the public use is often but technical.

It has also been held that any regulation which deprives any person of the profitable use of his property constitutes a taking of property and entitles him, under the constitution, to compensation, unless the invasion of rights is so slight as to permit the regulation to be justified under the police power. *Pumpelly v. Green Bay Co.* 13 Wall. 166; *U. S. v. Lynah,* 188 U. S. 445, 23 Sup. Ct. 349; *Grand Rapids B. Co. v. Jarvis,* 30 Mich. 308; *Edwards v. Bruorton,* 184 Mass. 529, 69 N. E. 328; *Hutton v. Camden,* 39 N. J. Law, 122.

In *Pennsylvania C. Co. v. Mahon, supra,* which involved the constitutionality of the so-called Kohler Act (Pub. Laws Pa. 1921, p. 1198), forbidding the mining of anthracite coal so as to cause the subsidence of certain buildings and places, it was held that such act cannot be sustained as an exercise of the police power so far as it affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved, and it is said:

"The general rule at least is that, while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. It may be doubted how far exceptional cases, like the blowing up of a house to stop a conflagration, go, and if they go beyond the general rule, whether they do not stand as much upon tradition as upon principle. *Bowditch v. Boston,* 101 U. S. 16, 25 Lawy. Ed. 980. In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. *Spade v. Lynn & B. R. Co.* 172 Mass. 488, 489, 52 N. E. 747, 43 L. R. A. 832, 70 Am. St. Rep. 298. We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said, this is a *question of degree,* and therefore cannot be disposed of by general propositions."

The opinion in the *Pennsylvania Coal Company Case* states that the facts in that case go beyond anything reported in the books. The act was declared unconstitutional by the supreme court of the United States as being in violation of the contract clause and due-process clause of the federal constitution.

Whatever may be our opinion as to whether the *Pennsylvania Coal Company Case,* above referred to, in its facts. is extreme, we are convinced, however, that the facts in the instant case far exceed it from the standpoint of an infraction of private rights. Not one square foot of private property for the Capitol Square could·be acquired for the pur-

poses of the State without resorting to the power of eminent domain, nor could a single item of material be obtained by the State for the construction of the building without making proper compensation therefor. The necessity for the acquiring of property on which to build a State Capitol in which are to be performed the governmental functions of the State is great, and it is readily conceded that a proper building is necessary for such a purpose. It has also been deemed necessary, in order to provide a heating system for the State Capitol, to construct a heating plant some considerable distance from the building, so as to avoid both danger from explosion and fire. Nevertheless, no one can contend that real property could be taken for this purpose without due compensation, nor could the right be acquired to construct a tunnel under private property, connecting the Capitol with such plant, in order to enable such heating plant to furnish heat for the Capitol, without acquiring the necessary easement under the soil of the owners of private property, pursuant to the power of eminent domain.

The public school system is guaranteed by the constitution, and it cannot be contended to the contrary that there is anything more essential and necessary to promote the general welfare and to maintain our democratic system of government than the establishment and maintenance of such system. Nevertheless, every inch of property, when acquired for such school purposes from private owners, must be taken under the power of eminent domain and compensated for. The same may be said of public hospitals and other similar institutions.

To deprive the plaintiffs, for the purposes stated in the act, of their right to erect the proposed building at the height contemplated, substantially amounts to a taking of their property right above a certain height limit. It is conceded in the answer of the defendant that the restriction included in the act not only materially affects the value of plaintiffs' proposed building but also of the real estate. It would

be useless to otherwise contend. Such restriction practically amounts to the granting of an easement over and above the ninety-foot height provided for in the act, for the benefit of the State and its Capitol, and such easement does not differ materially from the easement required for the tunnel to insure the connection of the heating plant with the Capitol; and counsel for the defendant admit that the latter is properly the subject of acquirement by the power of eminent domain. If such easement underground must be obtained by condemnation, then is there any reason why the State, in order to protect its interests, should not resort to a similar proceeding to acquire what amounts to an easement above the surface of plaintiffs' property?

The government of this great State, representing the ideals of its citizens on the subject of a democratic form of government, cannot afford, under the guise of a police regulation, to acquire rights to private property, as is attempted by the act in the instant case, unless under the constitution it is willing to make proper compensation therefor. This act is not designed to promote the public welfare of the private owners of property abutting upon the Capitol Square. It is solely based upon a selfish motive, and is confined to the protection from fire of the State's property. The State owns this property as any private citizen owns property. It constructed the Capitol building, with its vaulting dome, to a height far beyond anything contemplated by the plaintiffs in the erection of their proposed building. The building itself is one of the most beautiful in the country, and from the standpoint of cost involved an expenditure of many millions of dollars. From an æsthetic and architectural standpoint it stands as the equal, in the minds of many people, of any public building in the world. Notwithstanding the allegations in defendant's pleadings, it is a fact well known that as a fire-proof structure the Capitol building is as nearly invulnerable from the ravages of fire as human ingenuity and science can build it. It stands in the very center of a

large tract of fifteen acres, surrounded by the principal
business interests of the city of Madison.   It contains records
of inestimable value, necessary to the proper performance
of the governmental functions of the State.   This State has
been taught and has learned a valuable lesson in the con-
struction of a State Capitol, for the former Capitol was
destroyed by fire, and the necessity for a fire-proof building
has thus been forcibly impressed upon the minds of the
legislators and they have profited by the lesson.   What there
is about the building and its contents that is destructible by
fire communicated from buildings abutting the Square, with
the exception of certain books and records which could only
be reached by a conflagration in an extraordinary catas-
trophe, is beyond the imagination.   It is argued by counsel
for the State that without the building and its contents the
governmental functions would not only be greatly hampered
but to a large extent destroyed.   No conflagration, unless it
be political in its nature, can destroy the government, as was
demonstrated by the former fire of our Capitol building.
There is a very marked distinction between the instrumentali-
ties used in the performance of governmental functions and
the functions themselves.   The former are mere property
interests, and the State while exercising its governmental
functions is under obligations to the people at large to so
construct its building and to so create an environment with
respect to its own property as will protect it from the en-
croachment of fire or other natural elements.   An open space
of 387 feet between the Capitol building and the proposed
building would appear to insure an almost absolute protec-
tion from the dangers connected with a conflagration.   In
nearly all large cities in this country the government and
public buildings are located in the very midst of highly con-
gested areas, and are surrounded by innumerable structures
of an infinitely greater height than the proposed Piper build-
ing.   Experience has shown that only in extremely rare
cases have public buildings suffered material loss in large

cities where high buildings are located in close proximity to them.   The great Chicago fire and the Baltimore fire can hardly furnish a precedent.   In the Chicago area destroyed by the great fire the buildings were most of ancient methods of construction and were far from fire-proof.   A similar situation was presented in the Baltimore fire, that city being one of the oldest of the Eastern cities in the country.   The attending danger from fire in the instant case would be negligible and as remote as a destruction of the Capitol building by an earthquake.   Human ingenuity and foresight cannot forestall exigencies so remote and improbable, nor is it within the province of the police power to provide for such improbabilities.

We therefore hold that sec. 4444g of the Statutes constitutes an unreasonable exercise of the police power, and that the rights attempted to be acquired under said section can only be acquired by the exercise of the power of eminent domain, and that the act in question offends against the provisions of the state and federal constitutions above referred to.

We have been able to find no case involving a situation identical to the one here presented.   The learned attorney general and the special counsel for the State refer to *Attorney General v. Williams,* 178 Mass. 330, 59 N. E. 812, commonly known as the Copley Square Case, and *Cochran v. Preston,* 108 Md. 220, 70 Atl. 113.   The act construed in the former case provided for compensation to private property owners, and upon a second appeal of the case the supreme court of Massachusetts expressly affirmed its former decision and construed the act as a proceeding under the power of eminent domain.   This case, therefore, can be more readily cited in support of plaintiffs' contention.

The case of *Cochran v. Preston, supra,* in its facts is far from being parallel to the instant case.   Under the act in that case the legislature restricted the height of buildings around what is known as Monument Square.   The express

purpose of the act involved the protection of the buildings and monuments in that locality from damage by fire by restricting the height of contemplated buildings. We have here, therefore, an act which in its very purpose involves the reciprocal benefit and protection of the owners of buildings within a specified area. Sec. 4444g of the Statutes, as already stated, is designed solely for the protection of the Capitol building, being the property of the State. But assuming that the *Cochran Case* in its facts presents a situation similar to that in the instant case, we are unwilling to follow it as a precedent. The act involved in the *Cochran Case* was passed immediately after the great Baltimore fire. The great destruction of property in that conflagration was largely instrumental in bringing about the passage of the act. The court in its opinion graphically goes into detail of the ravages of that fire, and it is quite evident that under the stress of circumstances the court was to some extent influenced in its decision. Courts are composed of human beings, and however firm may be their desire to consider principles of law only, and to rest their decisions solely thereon, they are, after all, merely human agencies.

The act in the instant case is not invulnerable from successful attack on other constitutional grounds, but we will rest our decision upon the grounds above stated.

*By the Court.*—The order of the lower court overruling the demurrer of the plaintiffs is reversed, and the cause is remanded with instructions to sustain the demurrer, and for further proceedings according to law.

JONES, J., took no part.

CROWNHART, J. (*dissenting*). The State of Wisconsin, acting through its legislature, in 1836 selected Madison as its capital. Madison then was a wild forest far from civilization, but possessed of natural beauties of land and water attractively laid by nature for man's domicile. But it is of

record that the legislative mind was directed to this place by a well organized insistence of men in high places who held lands for speculative purposes. The location of the Capitol at Madison, and later the great State University, bringing with them civic pride, educational facilities, art, science, and literature, has given Madison a phenomenal advancement and has increased property values beyond that of any other city of like size in the state.

In 1904 its fine Capitol building was largely destroyed by fire, and then, at a great sacrifice, the State proceeded to the planning and erection of a new Capitol in keeping with the spirit of progress in Wisconsin delicately expressed by its motto "Forward." For many years it planned and built, and there resulted from its labors and sacrifices our wonderful Capitol, known the world over for its marvelous beauty and adaptation for the State's needs. It sets on an eminence in a square fifteen-acre park, adorned with majestic trees, the growth of many years, and beautiful shrubbery. The grounds are surrounded by streets. On the sides opposite the Square are built business blocks. Other streets converge at the Capitol Square, so that the Square is a business and ethical center of the city. In the streets surrounding the Square there is a great congestion of traffic. Adding to the height of the buildings facing the Square will aggravate this congestion. At the time of the enactment of the statute in question not more than one or two buildings had exceeded the height limit fixed in the statute, and most of them are much below that limit. For seventy years the State Capitol has been located at this same spot, and business blocks have grown up around the Capitol Square and have adjusted themselves so as not to mar its beauty, deprive it of light and air, or endanger it from fire. Land values surrounding the Capitol Square have been made by the Capitol, and they will be largely depreciated by anything that will mar the beauty of the setting or greatly add to the congestion of traffic and interfere with the comfort, con-

venience, and necessities of the people who frequent the place.   Sink the Capitol Square in a pit of darkness, cut off the free circulation of air, deface its beauty, endanger the trees that have taken scores of years to grow, and jeopardize the building and its invaluable records, treasures of art and science, and you have injured all the people of the State, financially, ethically, morally, and as a civic association. These are the facts well known to the legislature that enacted the law.   The legislature considered the greater public welfare, the common good, and within its police power sought to keep for the future the State's monument to its civic pride. The petitioners allege that the building they propose to erect will give them a revenue of $35,000 greater, annually, than one limited by the legislative act to ninety feet in height. It may be reasonably expected that some future business will put a like value on sky and air and for the same reason demand the undisputed right to go on and up, higher and ever higher, to the great danger and detriment of the people of the State.   Pointing to the decision of this court, they may well claim that all the people are less powerful than a few score of property holders who are so fortunate as to have received the benefit of the State's munificence, and who long for more.

The legal phases of this case depend upon the constitutionality of the statute which regulates the height of buildings about the Capitol Square.   Two questions presented are: Is the statute an exercise of the police power?   If so, is it a reasonable exercise of that power?

The contention of the appellant landowners is that the State has attempted to take their property by the statute in question without compensation.   This is based upon the common-law idea that the owner of a parcel of land not only owns the surface and the soil beneath to the center of the earth, but also owns the right to build on the surface to the sky above.   But the rights of the landowner are subject to the rights of others.   Every so-called right, whether of per-

son or property, is relative and is bounded and circumscribed by the rights of others, either as individuals or collectively as a community or state. The rights to life, liberty, and the pursuit of happiness are subject to qualification. They are not absolute. The right of free speech, guaranteed as it is by express language, has been held to be relative. *Schenck v. U. S.* 249 U. S. 48, 39 Sup. Ct. 247. Why, then, should a right of the owner of property, claimed under a like instrument, be absolute?. At the common law the lord of the soil could not exercise his property rights so as to injure the rights of his neighbors. The maxims of the common law applicable are: *Sic utere tuo ut alienum non lædas*—so use your own as not to injure another's property. Also: *Sic enim debere quem meliorem agrum suum facere, ne vicini deteriorem faciat*—every one ought so to improve his land as not to injure his neighbor's. And another: *Expedit reipublicæ ne sua re quia male utatur*—it is for the interest of the state that a man should not use his own property improperly. The law of nuisances illustrates these maxims in a thousand ways. Joyce, Nuisances.

The common law, by constitution, is made a part of the law of Wisconsin except in so far as it is modified by the constitution or statute. Sec. 13, art. XIV, Const.

The owner of land cannot put it to a use which will raise a stench or cause a noise depriving his neighbors of the use and enjoyment of their rights. This court has recently held that one may not establish upon his premises a business, having in view all of the surrounding circumstances, which will by its character be so disturbing to his neighbors as to injure the enjoyment of their property. *Cunningham v. Miller,* 178 Wis. 22, 189 N. W. 531. In brief, I believe that this court has held, and rightly so, that one may not use his property so as to injure others, whether that injury be communicated through the sense of smell, touch, hearing, or sight. The injury is the evil aimed at, and not the mode of its communication. Courts may not lose sight of the

fact that what may not have been considered injurious a generation ago may be so now.   With the growth and intensification of our civilization has come the need for handling the problems which have developed and are developing with it.   The cases sustaining zoning of cities are fundamentally based, I believe, upon the recognition by the courts of these problems and the right of the legislature to deal with them.   The statute in question is in the same class as zoning legislation.  It aims at the handling of the dangers and evils arising from excess congestion in cities.   It is an obvious fact, of which any schoolboy is aware, that high buildings mean greater hazard from fire, not only to the surrounding property but to the inmates of those buildings as well; that they bring with them congested street traffic, entailing danger to life and limb; that they cut off light and air from the surrounding property owners, not only making their property less valuable, but in cases making the lower parts of it uninhabitable; and in many cases they offend against the sense of sight to such an extent as to prevent the reasonable enjoyment of the public.

In the instant case the petitioning property owners adjoining the Capitol Square claim the right to build their Towers of Babel to the sky.   These buildings may shut out light and air; they may constitute a serious fire menace to this Capitol and city; they may choke the streets around the Square with congested traffic; they may offend against and even destroy the beauty and usefulness of our great Capitol which the people of this State have paid for in the sweat of their brows; and if it pleases these business men to use the absolute rights of the soil guaranteed them by the decision of this court, they may build monstrosities thereon of such shape and design as they may desire, even placing on the tops thereof the golden calf or a Chinese joss.  All that is required of these lords of the soil is that they build their Temples of Baal or what not so that they will be reasonably secure from falling on passers by.  "It is possible to hold the

disc of the dollar so close to our eyes that it excludes from sight every object of public interest and blinds us to every sentiment of humanity," said a former great Chief Justice of this court in *Brodhead v. Milwaukee,* 19 Wis. 624.

I cannot consent to a construction of the constitution which so exalts private rights above public rights. I do not concede that the owner of land has any absolute rights therein. I maintain that the law is settled that an owner of land holds his property subject to the reasonable rights of others. And I do not believe that the constitutionality of the statute need rest upon the narrower grounds of safety and health, though I think them ample to sustain the present statute as an exercise of the police power. If "public welfare" has not done so already, it is high time it took on a meaning for the courts which it has for the rest of the world. There is no reason why a judge' should painfully bow his back over a lawn mower to beautify his front yard, and then take pen in hand and deny the use and sense of the thing. We may well recognize the fact, which science has long known, that health and safety are closely related to the things that give comfort and joy to the mind and soul. If the legislature may validly regulate places of employment, working conditions, and the like, as to factory or workshop, why may it not take steps to give air and sunshine and decent working and living conditions for the clerk in an office or for our wives and children at home? There is not a scientist or physician who does not recognize the relation between clean air and sunshine to good health. Why not the courts? Are we so wedded to the past that we may not appreciate a new day until it has passed?

Other courts are beginning to appreciate that the law is adaptable to the present, to the reasonable enjoyment of our own lives as well as the enjoyment of a future generation. In a very recent decision the supreme court of Kansas said:

"The next contention is that the zoning ordinance and the statute which authorizes it have the effect of taking

defendant's property or of diminishing its value without compensation. It often happens that a valid exercise of the police power has such effect. The most common examples of this are found in statutes and ordinances relating to the health, safety, or morals of the people. With the march of the times, however, the scope of the legitimate exercise of the police power is not so narrowly restricted by judicial interpretation as it used to be. There is an æsthetic and cultural side of municipal development which may be fostered within reasonable limitations. See *Paola v. Wentz,* 79 Kan. 148, 152, 153, 98 Pac. 775, 131 Am. St. Rep. 290; *Remington v. Walthall,* 82 Kan. 234, 108 Pac. 112, 31 L. R. A. N. s. 957. Such legislation is merely a liberalized application of the general-welfare purposes of state and federal constitutions." *Ware v. Wichita,* 113 Kan. 157, 214 Pac. 101.

The supreme court of Minnesota recently used this language:

"It is time that courts recognized the æsthetic as a factor in life. Beauty and fitness enhance values in public and private structures. But it is not sufficient that the building is fit and proper, standing alone; it should also fit in with surrounding structures to some degree. People are beginning to realize this more than before and are calling for city planning, by which the individual homes may be segregated from not only industrial and mercantile districts, but also from the districts devoted to hotels and apartments." *State ex rel. Twin City B. & I. Co. v. Houghton,* 144 Minn. 1, 20, 174 N. W. 885, 176 N. W. 159.

It is one thing to divest an owner of his property, and quite another to limit or even prohibit an unreasonable use thereof. *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. Ct. 273; *Block v. Hirsh,* 256 U. S. 135, 41 Sup. Ct. 458; *People ex rel. Durham R. Corp. v. La Fetra,* 230 N. Y. 429, 130 N. E. 601; *Marcus Brown H. Co. v. Feldman,* 256 U. S. 170, 41 Sup. Ct. 65; *American C. M. Co. v. Special Coal and Food Comm.* 268 Fed. 563. In these cases it is not property which is taken, but the "right to use one's property op-

pressively" or unreasonably. *People ex rel. Durham R. Corp. v. La Fetra, supra.* As said by Judge BAKER of the United States circuit court of appeals for the Seventh circuit:

"To my mind there are two classes of cases that illustrate the right of the state to exercise its police power. Over on the one side fall all of the cases in which there is a public franchise, or a public service, or a public utility. Over on that side belong, also, innkeepers along with carriers. . . . But there are other cases in which none of these elements of a charter, or the power of eminent domain, or a public service, or a devotion of property to public use, appears. . . . These have no basis at all, except upon the power of the people to restrict the theretofore existing circle in which a person had his life, and the one within which he had his liberty, and the one within which he had his property, to bring these down narrower on account of conditions that were found oppressive to the people." *American C. M. Co. v. Special Coal and Food Comm.* 268 Fed. 563.

The decision of the majority in this case will present, I believe, serious obstacles in the way of natural and proper progress. When the time comes to consider the question of aeroplane traffic and other similar problems of our changing civilization it will prove embarrassing. Any such interpretation of the constitution is, in my opinion, erroneous. It is a mistaken idea of that instrument to assume that society crystallized with its enactment, and that our institutions and rights then in existence froze into unchanging rigidity. The constitution is not a social straight-jacket.

The several states are sovereign unless some constitutional limitation denies that power. *State ex rel. Carnation M. P. Co. v. Emery,* 178 Wis. 147, 189 N. W. 564; *Borgnis v. Falk Co.* 147 Wis. 327, 133 N. W. 209. "There must be progress, and if in its march private interests are in the way they must yield to the good of the community." *Hadacheck v. Sebastian,* 239 U. S. 394, 36 Sup. Ct. 143. "The political or philosophical aphorism of one generation is doubted by the next, and entirely discarded by the third; the race moves

forward constantly, and no Canute can stay its progress," said Mr. Chief Justice WINSLOW in *Borgnis v. Falk Co., supra.* And Mr. Justice HOLMES of the United States supreme court wrote to the same effect: "Circumstances may so change in time as to clothe with a public interest what at other times would be a matter of purely private concern." *Block v. Hirsh,* 256 U. S. 135, 41 Sup. Ct. 458. In his book, "The Spirit of the Common Law," Roscoe Pound says:

"The conception of law as a means toward social ends, the doctrine that law exists to secure interests, social, public, and individual, requires the jurist to keep in touch with life. Wholly abstract considerations do not suffice to justify legal rules under such a theory. The function of legal history comes to be one of illustrating how rules and principles have met concrete situations in the past and of enabling us to judge how we may deal with such situations in the present rather than one of furnishing self-sufficient premises from which rules are to be obtained by rigid deduction."

If further authority be needed to sustain the statute in question, we have it in the highest court in the land. *Welch v. Swasey,* 214 U. S. 91, 29 Sup. Ct. 567, affirming *People ex rel. Kemp v. D'Oench,* 111 N. Y. 359, 18 N. E. 862. Also the supreme courts of Massachusetts and Maryland have sustained similar legislation. *Attorney General v. Williams,* 174 Mass. 476, 55 N. E. 77; *S. C.* 178 Mass. 330, 59 N. E. 812; affirmed, 188 U. S. 491, 23 Sup. Ct. 440; *Cochran v. Preston,* 108 Md. 220, 70 Atl. 113, 23 L. R. A. N. s. 1163. That the statute is well within the police power of the state is shown by *Hadacheck v. Sebastian,* 239 U. S. 394, 36 Sup. Ct. 143; *Lincoln T. Co. v. Williams B. Corp.* 229 N. Y. 313, 128 N. E. 209. Unless the court can say that no reasonable man ought to give weight to such a public policy, then it should not declare the act unconstitutional. *Benz v. Kremer,* 142 Wis. 1, 125 N. W. 99; *State ex rel. Carnation M. P. Co. v. Emery,* 178 Wis. 147, 189 N. W. 564, and cases there cited.

On the ground of taking private property without com-

pensation the case of *Hadacheck v. Sebastian,* 239 U. S. 394, 36 Sup. Ct. 143, is a complete and convincing answer. There the plaintiff owned a clay mine for brick-making purposes.   It was formerly outside the city limits of the city of Los Angeles, but the property, with other property, was annexed to the city and thus came in conflict with the zoning ordinance of the city.   The destruction of plaintiff's property values was much greater and more complete than in the instant case.   It was not only a regulation of use in prospect, but it regulated a use long existing and in being. But the supreme court of California held that the zoning act was a valid exercise of the police power of the state, and its decision was upheld by the United States supreme court in a unanimous decision, so the former decisions of the United States supreme court, cited in the opinion of this court, must be considered modified or distinguishable from the instant case.   The court, in the *Hadacheck Case,* said:

"The police power and to what extent it may be exerted we have recently illustrated in *Reinman v. Little Rock,* 237 U. S. .171, 35 Sup. Ct. 511.   The circumstances of the case were very much like those of the case at bar and give reply to the contentions of petitioner, especially that which asserts that a necessary and lawful occupation that is not a nuisance *per se* cannot be made so by legislative declaration.   There was a like investment in property, encouraged by the then conditions; a like reduction of value and deprivation of property was asserted against the validity of the ordinance there considered; a like assertion of an arbitrary exercise of the power of prohibition.   Against all of these contentions, and causing the rejection of them all, was adduced the police power.   There was a prohibition of a business, lawful in itself, there as here.   It was a livery stable there; a brick yard here.   They differ in particulars, but they are alike in that which cause and justify prohibition in defined localities— that is, the effect upon the health and comfort of the community."

It is said that the State owns its property as any private citizen owns property.   This I think is hardly accurate.   The

State holds property as trustee for the public. The State's property is affected with a public interest, for every citizen has an interest in it. It should be noted in this case that the State has protected the adjacent property of private citizens from fire; has given them spacious grounds for light and air; has given beauty of view and enchantment of art and science, by locating its building in the center of its tract of land, and has surrounded it with fine trees, shrubs, and flowers. This is a sufficient inducement for reciprocal duties on the part of adjacent property holders to refrain from injury to the public property of the State. It is compensation for the statutory requirements imposed.

For the reasons stated, I respectfully dissent from the opinion of the court.