13362

## TAYLOR v. LEXINGTON WATER POWER CO.
### (163 S. E., 137)

*Messrs. D. W. Robinson* and *D. W. Robinson, Jr.,* for appellants,

*Messrs. Elliott, McLain, Wardlaw & Elliott,* for respond-
ent,

March 8, 1932.

The opinion of the Court was delivered by MR. JUSTICE
BONHAM.

The appellant is the owner of a large body of farm land
situated in Richland County on the Congaree River, two or
three miles below the confluence of the Saluda and Broad
Rivers which unite to form the Congaree, opposite the City
of Columbia.

The respondent is a corporation created by the Act of the General Assembly of South Carolina, approved Feb. 21, 1927, 35 St. at Large, p. 956, and was authorized by that act, and by the license granted it by the Federal Power Commission, to erect a dam on Saluda River some 10 or 12 miles above its point of union with Broad River, for the purpose of generating electricity for public and general use. This action is brought to recover for damages which plaintiff alleges he suffered by the overflow of his land in October, 1929, caused by the actions of defendant in the management and conduct of its dam in connection with freshets which precipitated floods of water upon and over plaintiff's lands. Arundel Corporation was united with Lexington Power Company as a defendant, but by consent of counsel at the trial it was eliminated, and is no longer concerned.

The complaint alleges the above-stated facts, the erection of the dam, of an unusual and extraordinary size, to impound a large volume, fall and pressure of water, the dam to be some 200 feet in height, ponding back water some 40 miles or more, and covering some 66,000 acres of pondage lands; that the work of constructing the dam, pondage and waterflow is inherently dangerous, especially to lands further down the Saluda river and those on the Congaree below the entrance of Saluda River with Broad River. That six weeks prior to October 1, 1929, the dam having reached a height of about 150 feet, defendant closed the channel of the river and began to fill up the pondage area of the dam, and had collected a considerable pondage therein when there came a heavy rainfall in the latter part of September, 1929, in and along the watershed of Saluda which would raise the waters of that stream ordinarily to flood stage and above; that defendant did for a number of days up to October 1, 1929, stop the flow of this water and accumulated a large volume of water in its uncompleted dam; that having accumulated this large volume, weight, and pressure of water, defendant opened its gates of the several tunnels or tubes, which it had constructed for that purpose, and turned the flood waters

loose with all the accumulated pressure, down Saluda River and Congaree River in and upon the lands of plaintiff. There follows a detailed statement of the damages alleged to have been done to plaintiff's lands, crops, dikes, wire fences, etc., for which he asks compensation in the sum of $50,000.00.

Plaintiff alleges that these injuries and damage were caused by the negligent, willful, wanton, and tortious acts of the defendant, in:

(a) Accumulating said large pondage of water:

(b) Withholding the flow of the stream in its natural and flooded condition till there was a tremendous accumulation of water; and

(c) In releasing it in large and unusual quantities during a further heavy rainfall, without any notice, safeguard, or protection against the injury which same would cause.

II. That by the aforesaid trespasses and wrong and tortious acts defendant had injured, taken, and destroyed plaintiff's lands and valuable property rights without making compensation, without due process and/or equal protection of the law, in violation of the provisions of the Constitution of the State of South Carolina and of the United States. The complaint further alleges that the dam, its maintenance and operation by defendant, obstructs and interferes with the natural flow of Saluda and Congaree Rivers, and the accumulation of water therein constitutes a menace to the lands of plaintiff, calculated further to destroy them, and do irreparable harm and injury and constituting a very special and continuing nuisance to the plaintiff and his property.

The prayer is for damages and injunctive relief.

The answer interposes a general denial; admits the residence of plaintiff and his ownership of the lands described in the complaint, and admits the corporate capacity of the defendant. Denies knowledge or information sufficient to form a belief as to the specifications of the nature and extent of the operations of plaintiff's farm; admits the erection of the dam but denies that it is inherently, or otherwise, dan-

gerous to plaintiff or his lands, or to any other person or property; alleges that the dam was constructed under a license granted by the Federal Power Commission and by virtue of the legislative charter granted to this defendant by the General Assembly of South Carolina, approved February 21, 1927, 35 St. at Large, p. 956, and defendant sets up and claims the rights, powers, and privileges of said license and charter; that some weeks prior to October 1, 1929, defendant closed the conduits passing through its dam in order to fill the dam with water; that following an unprecedented flood in the watersheds of Broad and Saluda Rivers defendant on or about October 1, 1929, in order to prevent the destruction of its dam, allowed a portion of the flood waters to pass through the dam, and defendant alleges that its action in withholding and subsequently discharging a portion of the said flood waters was of benefit to plaintiff, in that it minimized his injuries to what they would have been if defendant had allowed all the flood waters to flow through its dam without interference. And defendant alleges that at no time did it permit as much water to pass through its dam as came into the lake by reason of the flooded condition of Saluda River, and its action benefited plaintiff and reduced the damages to his lands.

For further answer to the allegations of the complaint that the dam is a menace to plaintiff's lands, and to his prayer for injunction against its maintenance and operation because the dam is a nuisance, all of which allegations of threat and menace defendant denies, defendant alleges that the dam does not affect plaintiff any differently in kind or degree than all the other landowners below the dam whose lands adjoin the Saluda, Broad or Congaree Rivers; that the dam was erected at a cost of about $20,000,000.00, largely furnished by the public throughout the United States who bought the bonds and debentures of defendant in reliance upon the rights granted defendant by the Federal Power Commission and the State of South Carolina as above set forth, and that the granting of the prayer for injunction would violate Section

10 of Article 1 of the Constitution of the United States, in that it would impair the obligation of defendant's contract with the State of South Carolina, created by and existing under the legislative charter granted by the Act approved Feb. 21, 1927, and would amount to taking defendant's property without due process of law and would deny to defendant the equal protection of the law in violation of Section 5 of Article 1 of the Constitution of South Carolina, and the Fourteenth Amendment of the Constitution of the United States.

Upon the issues created by the pleadings, there elaborately stated, the case came to trial before Judge Grimball and a jury at the February, 1931, term of the Court of Common Pleas for Richland County. At the close of the testimony the defendant moved for a directed verdict in its favor on these grounds:

1. The defendant had the legal·right to erect the dam under the license from the Federal Power Commission and its legislative charter, which right to erect carried with it the right to impound water.

2. The testimony shows that all landowners below the dam are affected in the same way; there is no difference in kind or degree of the effects of this water upon them. In such circumstances under the case of *Belton ·v. Wateree Power Company,* 123 S. C., 291, 115 S. E., 587, in order to recover plaintiff must prove negligence in the handling of the water.

3. There is no proof that the damage sustained by Mr. Taylor, if any, would not have occurred had this dam not been erected.

4. That the company, in an unprecedented flood, had the legal right to discharge the water through its conduits in order to protect its own property.

5. That the proof in this case was that less water was discharged through the conduits than was brought into the lake by the flood.

Judge Grimball granted the motion for directed verdict, because, in his opinion, "this case must be governed by the law and principles of a negligence case," and that plaintiff

had failed to prove negligence which was the proximate cause of the injuries complained of.

From this order and the judgment entered thereon plaintiff appeals on exceptions, nine in number, but which do not present that many questions for determination. We shall not consider them seriatim, but shall consider, and include in our determination of the appeal, all those which make issues germane to the appeal.

The Circuit Judge held that this action was founded on negligence, and that there was no proof of negligence which was the proximate cause of the damages which the complaint alleged that the plaintiff suffered.

Allegations of negligence were that defendant accumulated large pondage of water behind an unfinished dam, withholding the flow of the stream both in its natural condition and in its flooded condition until there had been a tremendous and dangerous accumulation of water, and then releasing it in large and unusual quantities during a further heavy rainfall, without notice, safeguards, or protection against the injury which the same would cause under the circumstances. There is evidence of the accumulation of a vast volume of water, of its release during further heavy rains; that this release superimposed under the flood waters already in the Congaree River from Saluda and Broad Rivers a great volume of water which formed an additional crest which fell upon the lands of plaintiff, already saturated and overflowed, and caused the damages to his land and property. There is testimony that defendant kept in touch with weather stations and must have or should have known of the continued falling heavy rains in the watershed of Saluda and Broad Rivers and that it was dangerous to turn loose this great body of impounded water, from which evidence it might be inferred that defendant was careless, or negligent of injuries which might be done to lower landowners.

R. E. Coomes, hydraulic engineer, witness for defendant, testified, page 56, pars. 221, 222, of the record:

"Q. Do you consider you allowed that water during that flood to get to such a point that it was more or less dangerous to the safety of the dam? A. Yes, sir. Otherwise we would not have started to build that spillway around the end. It would have been dangerous if it had rained any more.

"Q. If it had rained any more what would you have had to have done? A. Turn loose the water through the emergency spill."

"224 D/42. To prevent it overtopping the dam, because the water could not go through the pass as fast as it was coming into the lake. It could not pass through the conduits as fast as it was coming into the lake."

Wellwood, engineer, witness for defendant, said, page 74, at 294, 295, of the record:

"Recall this freshet of 1929 very distinctly 274/D/92, during the period of October 1st to the 5th or 6th. We had very heavy rains in that section and being in constant touch with the various weather bureaus scattered throughout the watershed, we had a great deal of warning as to what to expect, and knowing just the condition at the dam, that we had a structure that was not complete, we had to take every precautionary measure possible to eliminate every hazard to the construction, etc."

Pages 298, 299. "Q. I believe you had a freshet in September and then it stopped raining? A. Yes, sir; stopped raining for two or three days.

"Q. And then it came another? A. And then we had a great deal of rain. The heaviest rain I know in that watershed.

"Q. And now you are suffering up there because you were unable to take care of all of this flood water? A. That's right."

There is more testimony from plaintiff's and defendant's witnesses along this line, which in our opinion is relevant to the issue whether defendant was negligent in collecting this body of flood water behind an uncompleted earthen dam; and whether it exercised due care in its discharge; and

whether the machinery of the dam was adequate for that purpose.

It is true that the evidence hereabout is contradictory, nevertheless there was some testimony. Johnson and Roberts, for plaintiff, offer testimony of this character. Was the conduct of the defendant in the management and control of the dam in these circumstances that of a person of ordinary care and prudence? Mr. Johnson and Mr. Roberts, engineers, and witnesses for plaintiff, testify that they would have turned off the water to save the dam, but they do not approve or justify, but on the contrary criticize and condemn, the action of the defendant in collecting and impounding so large a volume of water in the face of heavy falling rains and indications of more approaching flood waters. They also criticize the manner of and machinery for turning off the water. This is emphasized by the fact that this immense earthen dam, which was to be 200 feet high, was then not more than 70 per cent. completed. These witnesses ascribed the overflow of plaintiff's lands to the actions of the defendant in the premises. But the defendant argues that Mr. Roberts admits that some of his and Mr. Johnson's calculations were based upon assumptions which are shown to be erroneous, and hence are valueless. The witness did not admit the incorrectness of his conclusions. His admissions made it a question for the jury to determine the force and credibility of his testimony. There is evidence that the defendant was about to build a spillway around the end of the dam for fear the tubes and penstocks would be unable to carry off the water and save the dam from breaking. Doctor Owings testified that he walked the trestle where the Saluda and Broad Rivers came together. He was asked: "How did it compare to you—that freshet that came in from the Saluda to the Broad?" He answered: "It was two or three feet above the Broad River—the current just slanted. I had never seen that before."

Here was evidence of the great volume of water coming down from the dam through the channel of Saluda River.

This was evidence from which the jury might conclude that in the light of the conditions as they existed it was negligence to turn loose this wall of water.

We are not to be understood to be passing upon the weight and sufficiency of this evidence. We are only holding that there was some evidence pertinent to the question whether defendant was negligent in the matter and manner of accumulating and turning off this large volume of water, sufficient to take the case to the jury.

We think it was error to grant the motion on the grounds assigned by the presiding Judge.

If it be conceded that there was no evidence to carry the case to the jury, was there not another ground upon which it ought to have been submitted? Paragraph 11 of the complaint is in these words: "11. That in and by the aforesaid trespasses of defendants, their wrongful and tortuous (tortious?) acts they have injured, taken and destroyed plaintiff's lands, and valuable property rights, without compensation, without due process and/or equal protection of the law, all in violation of the provisions of the Constitution of the State of South Carolina and of the United States."

Will that plea sustain the action? It has been held to be sufficient in numerous cases in this and other jurisdictions.

"The allegations of the complaint are appropriate to two causes of action—one based on negligence, and the other arising from the creation of a nuisance. When a person sustains a special injury, such as is alleged in the complaint, arising from the obstruction of a navigable stream, he is entitled to recover damages, on the ground that such obstruction constitutes a nuisance under the statute, as well as at common law." *Drews v. Burton, & Co.*, 76 S. C., 366, 57 S. E., 176, 178, citing *Carey v. Brooks*, 1 Hill, 365; *Steamboat Company v. R. R. Co.*, 30 S. C., 539, 9 S. E., 650, 4 L. R. A., 209, 14 Am. St. Rep., 923; *Steamboat Company v. R. R. Co.*, 46 S. C., 327, 24 S. E., 337, 33 L. R. A., 541, 57 Am. St. Rep., 688; 21 En. Law, 712, 713.

"A nuisance is in itself a wrongful act. Therefore it is not necessary to prove negligence, which is another wrong, in order to recover damages caused by the *nuisance*, as negligence is no part of that cause of action."

If it should be held, as it has been, that the doctrine of nuisance does not apply because the statute authorized the erection of the dam, then the plaintiff may reply on his plea this his property has been taken without due process of law and without making compensation, contrary to the inhibition of the State and Federal Constitutions.

From the case of *McDaniel v. Greenville-Carolina Power Company*, 95 S. C., 268, 78 S. E., 980. 6 A. L. R., 1321, we take the following:

"Mr. Justice Watts. This action was brought to recover damages. The complaint alleges that in 1907 the defendant power company erected across Saluda River a dam, which obstructed the natural flow of sand and water in the channel, causing the channel to fill with sand and mud, and thus causing the plaintiff appellant's land lying above the dam to be overflowed with mud, and sand, and water. There is no allegation that the dam was wrongfully or negligently constructed. The respondent interposed a demurrer to the complaint on the ground that the same did not state facts sufficient to constitute a cause of action 'in that the defendant was authorized by the statutes of this State to construct the dam in question across Saluda River, which is navigable at said point, and inasmuch as the complaint does not charge that the said dam was negligently constructed.'

"His Honor, Judge Shipp, sustained the demurrer and dismissed the complaint, and from this order appellant appeals, and by 11 exceptions questions the correctness of this ruling. The first three exceptions question the correctness in holding that the acts of the legislature of this State make Saluda River a navigable stream. These exceptions are overruled, as the acts of the legislature declare Saluda River to be a navigable stream as far up as McElhaney's ford (Act

Dec. 16, 1797, 5 St. at Large, p. 322), and it is conceded that McElhaney's ford is several miles above the land alleged to be damaged.

"The other exceptions raise the question that the building of the dam, even under authority of the legislature, did not excuse or exempt it from liability for damages to riparian landowners above the dam for injuries done to their land by reason of the erection of the dam, and that the legislature only had the power over the stream to allow dams and locks built for navigation purposes, and that the respondent is a private corporation, engaged in the business of generating electric power for sale, and liable for all damages done to lands above it which naturally flow from the erection of the dam, even though the act of the legislature authorizing the building of the dam did not provide for such compensation. We think these exceptions should be sustained. The legislature had the authority to authorize and allow the respondent to build the dam in question across Saluda River, which had been declared to be a navigable stream; but it had no right to give them the power to build the dam and exempt from liability to any landowners on the stream, either above or below the dam, that might suffer any injury to their property by reason of the erection of the dam, even though by authority of the State. They could only be permitted to put the dam across the river, and, if by so doing they injured any landowners on the stream, they should be required to respond in damages for such injury. If in the erection of the dam they exercised the highest degree of care, and were in no manner negligent, and conducted it in the most skillful manner, yet, if by the building and maintenance of the dam they injuriously affect their neighbors, they are liable in damages. In other words, the legislature had the right to grant permission to erect the dam, and respondent had the right to build and maintain the dam, yet, if by so doing they injure landowners on the stream, and the erection and maintenance of the dam is the direct and proximate cause of the

injury to the landowners, they must pay damage; otherwise it would deprive property holders of their property and take it from them without compensation, and would be unlawful, unjust, and contrary, not only to all law, but all reason and justice. It may be that when a dam is first built that it will not injuriously affect land some distance from it, and for a long time there will be no cause for them to complain, but when the pond, made by the dam, fills with mud, sand, trash, and other things, causes overflows and injury to lands, then the party injured has a cause of action, if the building and maintenance of the dam is the direct and proximate cause of their injury. The complainant in this case alleges that the water from this dam backed up on her lands, and overflowed them with water, mud, sand, and other deleterious deposits. The complaint states a good cause of action. The fact that respondent's act in building the dam was sanctioned by the State, and it did it under authority of law, and committed no fault in the erection of its dam, does not relieve it, if by so doing it injures or destroys other people's property without compensating them. I know of no law that will permit a corporation or an officer thereof, even though he is authorized by the State, to take the property of an individual for any purpose whatsoever, however beneficial it may be to the public * * * without compensation; such pretended authority would be void and could afford no protection to any one. If the appellant has been injured as a natural result by the erection and operation of this dam, and the operation of the same is the direct and proximate cause of injury to her land, then she is entitled to such damages as would compensate her for such injury."

From the same case this citation is taken: "While a dam in a navigable stream, if authorized by the act of the legislature, cannot be indicted as a public nuisance for obstructing the stream, still the act is no protection against injuries to a private owner." Citing 8 Am. & Eng. En. Law, 704.

The learned Justice—afterwards Chief Justice of the Court—concludes his opinion with this pronouncement of the law: "To allow the respondent to escape paying compensation to the appellant, if appellant has been injured as she alleges in her complaint, would nullify and wipe out Article 1, Section 17 of the Constitution of 1895. We have no doubt that the respondent should be liable for all damages, if any, caused by the building of said dam, even though they were authorized to build."

Counsel for both parties rely upon the case of *Belton v. Wateree Power Company,* 123 S. C., 291, 115 S. E., 587. And each of them may find comfort therefrom, since the ground of application of the principles of that case by each is founded upon his view of the facts. The one contends that there is in the case now on appeal no evidence of negligence, while the other contends there was negligence in the management of the dam on the occasion in controversy. Unquestionably the case is authority for the rule that: "If a noxious act results in an injury peculiar to plaintiff or some special inconvenience or discomfort not experienced by the public at large, defendant cannot invoke the protection of any statute purporting to authorize it, in view of the constitutional provision forbidding the taking of private property for a public use without just compensation."

In the very able and elaborate opinion of Mr. Justice Cothran in the case of *Chick Springs Water Co. v. Highway Department,* 159 S. C., 481, 157 S. E., 842, 847, this question of the right of one whose property has been taken for a public purpose, to compensation for the taking under the constitutional provisions, even against a department of the government, is thoroughly discussed and determined. The learned Justice premises his opinion with this statement:

"The authorities hold that the constitutional provision is self-executing.

"It is within the power of those who adopt a constitution to make some of its provisions self-executing, with the

object of putting it beyond the power of the legislature to render such provisions nugatory by refusing to pass laws to carry them into effect.  *  *  *

"A constitutional provision against taking personal property for public use without just compensation therefor is self-executing, even though the method of ascertaining such compensation is left for legislative determination. When the Constitution forbids damage to private property, and points out no remedy and no statute affords one for the invasion of the right of property thus secured, the common law, which provides a remedy for every wrong, will furnish the appropriate action for the redress of such grievance." Citing 12 C. J., 732.

Many other authorities are cited and quoted by the opinion. We shall quote only this one on this point; it is taken from *Randal v. State Highway Department*, 150 S. C., 302, 148 S. E., 57, 58. Decree by Judge Johnson approved by the Court: "In this State neither the commonwealth, nor any of its political subdivisions, is liable in action *ex delicto* unless made liable by express enactments of the General Assembly, except where the acts complained of, in effect, constituted a taking of private property for public use without just compensation." Citing: *Young v. City Council*, 20 S. C., 116, 47 Am. Rep., 827; *Mullinax v. Hambright*, 115 S. C., 22, 140 S. E., 309; *Faust v. Richland County*, 117 S. C., 251, 109 S. E., 151, 154; *Derrick v. Columbia*, 122 S. C., 29, 114 S. E., 857; *Kneece v. Columbia*, 128 S. C., 375, 123 S. E., 100.

Others might be added to these citations, but it is deemed unnecessary to do so. The principle is sufficiently established by these cases.

What constitutes a "taking" within the meaning of the constitutional inhibition against taking private property for public use without making compensation therefor?

The case of *Faust v. Richland County* was heard by the Court *en banc*. Circuit Judge Moore, in an opinion con-

curring in the leading opinion, said: "It is an actionable injury for one to collect surface water into an artificial channel, and thence cast the same in concentrated form upon adjacent lands." Citing *Touchberry v. Railway Co.,* 87 S. C., 415, 69 S. E., 877; *Brandenburg v. Zeigler,* 62 S. C., 18, 39 S. E., 790, 55 L. R. A., 414, 89 Am. St. Rep., 887; *Cain v. Railway Co.,* 62 S. C., 25, 39 S. E., 792.

In the case of *Chick Springs v. Highway Dept.,* 159 S. C., at page 491, 157 S. E., 842, 846, Mr. Justice Cothran, delivering the opinion of the Court, said: "The authorities are unanimous that the flooding and injuring of property by the negligent impounding of a natural water course is a 'taking' under the constitutional provision."

This rule would apply as well to the negligent handling of the impounded water, the dam by which it is impounded, and the structures by which it is released.

In the same opinion the learned Justice said:

"In 10 R. C. L., p. 70, § 61, it is said:

" 'Covering Land with Water or Earth.—

" 'There may be a taking of property in the constitutional sense although there has been no actual entry within its bounds and no artificial structure erected upon it. When a public agency acting under authority of a statute uses land which it has lawfully acquired for public purposes in such a way that neighboring real estate, belonging to a private owner, is actually invaded by superinduced additions of water, earth, sand or other material so as effectually to destroy or impair its usefulness, *there is a taking within the meaning of the constitution.'* " (Italics added.) Citing *Faust v. Richland County,* 117 S. C., 251, 109 S. E., 151; *Derrick v. City of Columbia,* 122 S. C., 29, 114 S. E., 857; *Kneece v. City of Columbia,* 128 S. C., 375, 123 S. E., 100; *McNinch v. City of Columbia,* 128 S. C., 54, 122 S. E., 403; *Wilson v. City of Laurens,* 134 S. C., 271, 132 S. E., 590.

In the case of *White v. Southern R. R. Co.,* 142 S. C., 284, 140 S. E., 560, 564, 57 A. L. R., 634, Mr. Justice Stabler for the Court said: "'The word 'taking' in the con-

stitutional provision cited is not limited in its meaning and application to cases in which there is an actual physical seizure and holding of property, but is broad enough to include cases in which the access to abutting premises is obstructed by the change of grade of a highway or there is such physical injury to property as results in destruction or substantial impairment of its usefulness." Citing 20 C. J., 697, and cases there cited: "Any regulation which deprives any person of the profitable use of his property constitutes a taking of property and entitles him * * * to compensation, unless the invasion of rights is so slight as to permit the regulation to be justified under the police power." *Piper v. Ekern,* 180 Wis., 586, 194 N. W., 159, 162, 34 A. L. R., 32. See 6 R. C. L., 473.

We do not deem it necessary or advisable to consider other questions made in the pleadings and by argument of appellant's counsel. We have considered only those which are, in our opinion, necessary to the determination of the questions arising from the order of the Circuit Judge directing a verdict for the defendant.

It is the opinion of this Court that the order of the Circuit Judge, and the judgment entered thereon, should be reversed, and the case remanded for retrial. And it is so ordered.

MR. CHIEF JUSTICE BLEASE, MESSRS. JUSTICES STABLER and CARTER and ACTING ASSOCIATE JUSTICE S. W. G SHIPP, CIRCUIT JUDGE, concur.