JOHN J. SEXTON AND EILEEN G. SEXTON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91718.    Filed September 24, 1964.

*Edward R. Kent* and *George H. Litow,* for the petitioners.
*Donald J. Forman* and *Arthur N. Nasser,* for the respondent.

BRUCE, *Judge:* The respondent determined deficiencies in income tax of the petitioners for fiscal years ended June 30 in 1956, 1957, and 1958 in the respective amounts of $7,709.87, $5,357.08, and $10,550.40. The principal issue is whether the petitioners are entitled to deductions for amortization, depreciation, or depletion with respect to the cost of property purchased for use in the operation of a garbage and refuse dump. If deductions of such a nature are allowable, there is a further issue concerning the valuation of the property involved.

Some facts are stipulated.

### FINDINGS OF FACT

The stipulated facts are so found and the stipulation and exhibits attached thereto are incorporated by this reference.

The petitioners are husband and wife. They reside in River Forest, Ill. They filed joint Federal income tax returns with the district director of internal revenue at Chicago, Ill., for fiscal years ended on June 30 in 1956, 1957, and 1958. Their books were kept and returns filed on a cash basis of accounting.

John J. Sexton, hereinafter referred to as the petitioner, is, and has been for more than 30 years, in the business of operating refuse and garbage dumps. He is also an excavating contractor and has carried out dirt-moving contracts. In carrying on his dump business he has filled more than 100 holes in the ground. In this business he has some 600 customers in the Chicago area, including refuse trucks of the city of Chicago and other municipalities, as well as private scavengers. He acquires dumpsites by rental or purchase and charges his customers for dumping at a price per cubic yard.

Prior to 1952 the Illinois Brick Co. was owner of a tract of land south of Chicago, near the city limits, bounded on the north by 119th Street, on the south generally by 123d Street (although there was a small parcel south of that street), on the east by Ashland Avenue, and on the west by the tracks of the Chicago Rock Island & Pacific Railroad Co. suburban line. The main line of the railroad passed through this area in a north-south direction. The land had been used by the brick company as a source of clay and contained two deep pits from which clay had been extracted to a depth in some places of 50 to 60 feet. One pit, referred to as the east hole, lay between 122d and 123d Streets, Ashland Avenue, and the main line of the railroad. The other, referred to as the west hole, lay between the two lines of the railroad and extended from 119th Street to 123d Street.

Under date of April 23, 1948, the petitioner and Lawrence F. Fleming, copartners doing business as Fleming-Sexton Co., entered into an agreement with the Illinois Brick Co. whereby the partnership was granted the exclusive right until December 31, 1952, to deposit in the above-described excavated land clay, brickbats, earth, cinders, tile, rock, concrete, stone, rubbish, sand, industrial refuse, and other miscellaneous fill. It was further agreed that the depositing was to begin at the 119th Street end of the excavation and continue southward; that the partners would operate a bulldozer to keep the filling level; that 6 inches of cinders or earth would be put on top when the filling reached 6 inches below street grade; that the partners would pay an amount ranging from 5 to 10 cents per cubic yard for material deposited, depending on the quantity deposited; that records would be kept of the material deposited, daily reports made to the owner, and monthly payments made of the charges due; that material would be measured before dumping; that the partners would keep a man on the premises to measure and record the amounts deposited; and that the partners would conduct the depositing in such a way that no dust or noxious or disagreeable fumes or odors would emanate from the premises. The agreement was terminable on 60 days' notice by either party.

The petitioner began dumping operations on these premises in February 1949 and continued under the foregoing agreement to operate the dump until April 1952. In that period he paid approximately $50,000 as rentals for the privilege of dumping there, and certain parts of the excavated areas were filled to levels approximating the street level.

In April 1952 petitioner entered into a contract for deed with the Illinois Brick Co. to purchase, at the price of $150,000, the premises which included the west hole and the east hole and surrounding land and a small piece of level ground south of 123d Street near the land

on which the east hole was situated. He was to pay $75,000 at the time of conveyance and $75,000 in semiannual installments of $3,750 secured by a deed of trust. The brick company delivered a deed pursuant to this contract, which deed was recorded in July 1952.

The petitioner engaged a surveyor to compute the amount of space available for dumping on these premises. The surveyor's report, dated May 3, 1952, reads:

According to your recent request, the writer performed the field engineering survey necessary to compute the volume of potential fill to be deposited in the deep clay holes and on your land adjoining the perimeters of said clay holes. The following quantities represent the results of my computations:—

*Property South of 119th St., Between Railroads*

#1—The north 13.8 acres require 66,820 Cu. Yds. of Fill.

#2—Clay hole south of #1 requires 1,321,666 Cu. Yds.

#3—Balance of land adjacent to the perimeter of the clay hole described in #2 requires 113,460 Cu. Yds.

*Property East of Main Line Railroad*

#4—Clay hole west of Ashland Ave. requires 938,070 Cu. Yds.

#5—Balance of land adjacent to the perimeter of the clay hole described in #4 requires 83,283 Cu. Yds.

#6—Parcel No. 3 lying south of 123rd. St., and east of Main line railroad to Lincoln St., requires 5,488 Cu. Yds.

According to plats issued by the Illinois Brick Co., your property contains approximately 88.8 acres and in the break down of this acreage, my calculations indicate the following:—

"A"—Both clay holes aggregate 38.6 acres.

"B"—Land adjacent to the perimeters of both clay holes aggregate 50.2 acres.

"A"—Requires 2,259,736 Cu. Yds. of Fill. ⎫
"B"—Requires   269,051 Cu. Yds. of Fill. ⎬Total  2,528,787  Cu. Yds.

The enclosed scaled drawing indicates the affected areas and the legend shown thereon is self explanatory. You will note that on the above 88.8 acres I have assumed the top of the potential fills to correspond with the average adjoining established streets and railroad grades.

At the time the petitioner was negotiating the purchase of the property, the brick company offered to withdraw a small parcel from the property offered, stating:

Since you brought up the question of not wishing to buy land which was unexcavated, I wish to state that the approximate two acres at the south end of the clayhole, which is level ground, not excavated, and is only two feet below street level, and commonly known as Parcel No. 3, can be deducted from our asking price of $150,000.00 for the entire clayhole at the rate of $500.00 per acre.

I know that you are desirous of buying land only for dumping purposes and, therefore, we are willing to withdraw the above 1.7 acres from our agreement as outlined above.

The representatives of the brick company knew of the petitioner's business and of his purpose in acquiring the property.

The petitioner did not exclude the 1.7-acre parcel as the seller offered to permit him to do. The property he purchased amounted to approx-

imately 88.8 acres. At the time he made this purchase he was renting other property for dumping purposes. The owners of some of these properties were unwilling to sell, as they received an income from the petitioner for his use of the land.

At the time of the survey the deep holes were of an average depth of 35 to 40 feet below the surrounding street grades. The areas at the perimeters of the holes had been filled to such a level that they averaged some 3 to 7 feet below the street grades.

From the time of purchasing the property until 1960 the petitioner carried on the dumping business at this location, using the west hole alone. The bulk of the material dumped, perhaps 90 percent of it, was garbage, both household and commercial. Other material dumped included broken concrete, bricks, tile, plaster, discarded lumber, wastepaper, sewer material, and discarded matter from stockyards or "soup" makers. The dumping was carried out in accordance with a sanitary fill method of 5-foot layers covered with 6 to 12 inches of earth daily to eliminate rodents, flies, odors, and blowing paper. After August 1, 1960, dumping of garbage in the west hole was stopped, and dry fill only was dumped thereafter. There is to be some 6 feet of earth or clay as the final cover. Garbage was dumped in the east hole after August 1, 1960.

In operating the dump, records were kept of the truckloads arriving at the site, measuring the cubic yards and type of material. In the fiscal year ended in 1956 the records showed that over 1 million cubic yards were delivered. The petitioner had the property surveyed at the end of the fiscal year ending in 1957 to determine the amount of space filled and the amount remaining. The quantity dumped was not an accurate record of the space used because of compaction of the material after dumping. After the survey the space used was recomputed back to 1952 and compared with the quantity dumped. On this basis, the petitioner estimated that the amount of space filled was 15 or 16 percent of the cubic yards of material as measured in trucks delivering it to the dump. At the end of the fiscal year 1958 another survey was made, and the space filled was calculated from the survey. The space filled in the fiscal year ended in 1958 was 330,406 cubic yards. From the surveys and records the petitioner's accountant determined the amount of dumping space consumed in the fiscal years ended in 1956 and 1957. This amounted to 164,678 and 163,731 cubic yards, respectively. The reason for the larger quantity in the year ended in 1958 was in part that some scavenger trucks had compacting machinery and there was little further compaction of the material dumped when delivered.

Petitioner paid real estate taxes on the property sold him by the brick company in 1952 in the following amounts in the years 1953 through 1958:

| Year | West of main line R.R. | East of main line R.R. |
|------|------|------|
| 1953 | $909.84 | $560.10 |
| 1954 | 935.44 | 568.88 |
| 1955 | 2,141.56 | 617.50 |
| 1956 | 2,295.12 | 657.02 |
| 1957 | 2,471.22 | 701.90 |
| 1958 | 2,744.36 | 817.28 |

The petitioners' income tax returns showed the following items, among others:

| | Fiscal years ended June 30— | | |
|------|------|------|------|
| | 1956 | 1957 | 1958 |
| Total receipts | $580,022.81 | $630,778.67 | $690,123.39 |
| Cost of labor | 45,837.30 | 48,651.83 | 55,154.94 |
| Salaries and wages | 67,117.23 | 74,862.55 | 83,055.24 |
| Rent on business property | 112,923.35 | 123,061.10 | 105,114.80 |
| Depletion | 9,921,46 | | |
| Amortization | | 6,868.05 | 13,216.24 |
| Net profit | 123,418.52 | 158,467,96 | 140,198.72 |
| Adjusted gross income | 126,102.58 | 159,510.70 | 146,127.58 |
| Tax | 59,987.58 | 66,992.08 | 63,433.15 |

The petitioners' return for the fiscal year ended in 1958 included the following schedule:

| Property—119th St. dumpsite | | Cubic yards | Amount to be amortized |
|------|------|------|------|
| Acquired Apr. 1, 1952, cost | $150,084.90 | | |
| Less—land value | 44,000.00 | | |
| Amount to be amortized | 106,084.90 | 2,528,793 | $106,084.90 |
| (Amortization rate .04 per cu. yd.) | | | |
| Amortization claimed in prior years: | | | |
| June 30, 1952 | | 23,314 | 6,160.96 |
| June 30, 1953 | | 96,700 | 4,056.03 |
| June 30, 1954 | | 108,266 | 4,541.85 |
| June 30, 1955 | | 135,620 | 5,689.36 |
| June 30, 1956 | | 164,678 | 6,908.28 |
| June 30, 1957 | | 163,731 | 6,868.05 |
| Reserve for amortization June 30, 1957 | | 692,309 | 34,224.53 |
| Unamortized balance June 30, 1957 | | 1,836,484 | 71,860.37 |
| Less—inventory June 30, 1957: | | | |
| West hole, per surveyor's report | 809,637 | | |
| East hole, no change | 696,441 | 1,506,078 | |
| Amortization this year | | 330,406 | 13,216.24 |

In 1954 the petitioner purchased from the Illinois Brick Co. 176 lots of vacant land north of the east hole. This land had been subdivided into lots, zoned for residential use, and sewer and water lines and sidewalks had been installed. The petitioner purchased the land

by lots, and the price he paid was based on lots. The price was $38,000, to be paid in installments. His purpose in buying this land was to prevent people from building homes near his dump and putting him out of business on the ground he was creating a nuisance. These lots aggregated about 12½ acres.

The following sales of land were made in the general vicinity of the petitioner's dump at the dates shown:

1. In October 1947 there were sales of two tracts at 131st Street and South Francisco Avenue in Blue Island, Ill., about 2 miles southwest of the petitioner's dump, of 5 acres for $4,000 and another 5 acres for $2,500;

2. In December 1950 there was a sale of 23.77 acres at 123d Street and Kedzie Avenue, about 2 miles west of the petitioner's dump, by the Illinois Brick Co. for $18,000, or about $750 per acre;

3. In November 1951 there was a sale of 22.57 acres at 123d Street and the Grand Trunk Railroad, nearer the petitioner's dump than the preceding sale, for $19,288, including some buildings, also by the Illinois Brick Co.;

4. In November 1952 a triangular tract of land at about 115th Street and next to the right-of-way of the Chicago Rock Island & Pacific Railroad tracks, about 1 mile north of the petitioner's dump, was sold for $14,550. This tract contained 97,000 square feet, or about 2.23 acres. This land was later built upon and used;

5. On October 21, 1953, a tract of land of 9.1 acres was sold. The revenue stamps on the deed amounted to $82.50, indicating a price of $75,000, or at least $7,000 per acre. This was approximately 1 mile east and 1 mile north of the petitioner's dump;

6. On October 23, 1954, a small tract of land at 120th Street in Blue Island, Ill., near the railroad tracks and near the dump, was sold. The revenue stamps on the deed amounted to $3.85 and indicated a purchase price of $3,500, or $7,000 per acre;

7. On September 2, 1954, a tract of land at Cottage Grove Avenue and 119th Street, about 3 miles east of the petitioner's dump, was sold for $22,500. The parcel was about 6 acres;

8. In 1955 a tract of about 100 acres on 123d Street between Crawford and Homan Avenues, about 2 miles west of the petitioner's dump, was sold for $90,000. This property had street frontage;

9. In July 1956 the National Brick Co. sold to John J. Sexton some 77 acres of property at one of its brickyard sites, including 27 acres of excavated land, at $1,000 per acre and 50 acres of unexcavated land at $500 per acre adjoining the pit. This was at Chicago Heights, some 8 or 10 miles south of the property here involved.

A reasonable estimate in 1952 of the value of the property then acquired from the brick company, when ultimately filled by dumping, was $44,000.

This case presents a novel issue—may a taxpayer's investment in the space contained in an abandoned claypit or excavation and used in his business be the subject of an allowance for depreciation?

The petitioner is an operator of several garbage or refuse dumps. He purchased a certain tract of land especially suitable for his business because of pits or excavations left from the extraction of clay deposits. In the course of his business the pits are gradually filled, and when the process is completed the land is of no further use in his business.

The petitioner contends that he purchased, not land, as such, but space for dumping; that as this space is used, a part of his investment is consumed; that the amount of space used each year is measurable and has been measured; that the "salvage," or remaining value of the land after all the space is exhausted, is proved; and that he is entitled to deduct the value of the part of his investment in the space used each year, either as depletion, depreciation, amortization, or ordinary and necessary expense of his business.

The respondent argues that the only asset purchased by the petitioner was land and that the cost of land cannot be depreciated, depleted, or charged off as amortization or business expense until the land is sold and the loss, if any, is sustained in a closed transaction.

This raises the question whether the space contained in a pit or excavation can be recognized as a property right separate and apart from the land.

In *Mattie Fair*, 27 T.C. 866 (1957), acq. 1957-2 C.B. 4, a gift was made to a charitable foundation of the right to build and maintain a five-story addition above an existing two-story building. We upheld the right of the donors to claim a deduction for a charitable contribution of the value of the rights and interests so conveyed. We there said (p. 872):

The right to use the air space superjacent to the ground is one of the rights in land. These air rights are frequently the most valuable rights connected with the ownership of land since the value of commercial property consists almost exclusively of the right of the owner to erect business and industrial structures thereon. Cf. *Piper* v. *Ekern*, 180 Wis. 586, 194 N.W. 159, 161 (1923). The sale or lease of superjacent air space is not at all uncommon in large cities.[3] Attempts to subdivide the superjacent air space into horizontal strata or air lots poses difficult questions.[4] But there does not seem to be any policy of the law prohibiting these transactions and their validity has been recognized.[5]

[Footnotes omitted.]

See also special ruling letter dated April 10, 1964 (C.C.H. par. 6636, P.–H. par. 54, 951), and Rev. Rul. 64–205, promulgated July 27, 1964 (I.R.B. 1964–30), wherein it was held that the gratuitous conveyance to the United States of a restrictive or "scenic" easement in real

property is a charitable contribution and entitled the taxpayer to a deduction under section 170 of the 1954 Code to the extent of the fair market value of the restrictive easement. The restrictions in question included limitations on the height of buildings which might be constructed on such real property. In effect these rulings recognize a property right in the airspace superadjacent to real property which is subject to separate evaluation and conveyance. The rulings further provide for the adjustment of the taxpayer's basis in the real property by eliminating that part of the total basis which is properly allocable to the restrictive easement granted.

The State of Illinois, by statute, specifically allows railroads to subdivide, improve, and sell the superadjacent airspace. Ill. Ann. Stat., ch. 114, sec. 174(a) (Smith-Hurd).

The present situation does not involve a separation of rights in superadjacent airspace from the title to the soil, but the petitioner seeks the recognition of the existence of a separate property right in the space superadjacent to the land which was the inducement for his purchase of the land and of the gradual reduction in the value of the property to him for his business purposes as the space is filled and consumed. A representative of a company which sold another pit to the petitioner testified that his company knew of the intended use of the land and therefore charged the petitioner more for the excavated land than for level land. Of course, if this had been level ground the petitioner would have had no use for it.

The case of *People* v. *Chicago Union Lime Works Co.*, 361 Ill. 304, 198 N.E. 1 (1935), involved an abandoned stone quarry on the southwest side of Chicago used as a dump. The excavated pit had a capacity of 3,506,418 cubic yards. The issue concerned the assessed value of the property. The court upheld the valuation which took into consideration its probable income capacity as a dumping ground over a 20-year period. In the computation, the assessor assumed a sinking fund of 4 percent per annum to reimburse the investor by reason of the depletion of the property as a dumping ground at the end of the period. The reduction in value to the owner as the pit was filled was thus recognized and taken into consideration in the valuation of the property.

The Internal Revenue Code of 1954 has provisions allowing deductions for amortization of emergency facilities (sec. 168), grain storage facilities (sec. 169), and bond premium (sec. 171). None of these can be related to the petitioner's contention here.

Section 611 of the Code authorizes the allowance of a deduction for depletion. This is provided for only in the case of mines, oil and gas wells, other natural deposits, and timber. The petitioner contends that the airspace in the clay pits was a natural resource and that once

filled it was exhausted for further use in his business. The respondent contends that air is not a natural deposit; that there is no statutory basis for the claim for depletion thereof; that the allowance for depletion is intended to apply to natural deposits, such as coal, oil, or metals, extracted from the earth, while the petitioner's operation was, to the contrary, a filling-up process. The space was a manmade depression, not a natural deposit. Section 613(b)(6) specifically denies depletion as to "minerals from * * * the air." The depletion provisions do not apply in the present case.

Section 167 of the Code allows a depreciation deduction of a reasonable allowance for the exhaustion, wear, and tear of property used in the trade or business of the taxpayer. The petitioner contends that this provision applies with reference to the exhaustion of the space purchased for use in his business. The essence of the statutory deduction is to permit a taxpayer to recover annually his capital investment in a wasting asset over the useful life of the asset in his business. *Massey Motors* v. *United States*, 364 U.S. 92 (1960).

The Income Tax Regulations relating to depreciation of intangibles, sec. 1.167(a)–3, provide:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * *

It is clear from the evidence that the petitioner acquired the land because the pits provided space suitable for use in his business and that the gradual filling of this space exhausted it. Since rights in space have been recognized as property subject to transfer separately from the related land, we perceive no reason why such rights should not be the subject of depreciation as wasting assets in the business of this taxpayer.

In determining the amount allowable as a deduction for depreciation, the regulation, sec. 1.167(a)–1(a), states that the allowance is that amount which should be set aside for the taxable year so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal its cost or other basis. Section 1.167(a)–1(c) defines salvage value as the amount, determined at the time of acquisition, which is estimated will be realizable upon disposition of the asset when it is no longer useful in the taxpayer's business and is to be retired from his service.

The petitioner paid $150,000 for the 88 acres of land which he acquired for its dumping space. He estimated the value of level ground in that vicinity as $500 per acre, and therefore estimated at the time of acquisition, in 1952, that the salvage, or remaining value of the land, when no longer useful in his business, would be $44,000.

The respondent contends that the salvage value of the property, estimated at the time of its acquisition in 1952 and upon the assumption that it would be filled in, is not less than the original cost. If the fact is that the property would have equal or greater value after being filled in, the petitioner would have no diminishing investment to write off. Witnesses for the respondent conceded that the property, after filling the excavated areas with compacted garbage, would not be suitable for building construction without the use of pilings or caissons to support structures, which would make construction extremely expensive, but said that it could be used for a material service yard or other open-use occupancy, such as stockpiling sand or gravel, concrete batching, or as an automobile junkyard. Some areas along the nearby highway could be used for a gasoline filling station or drive-in restaurant. Some amount of settlement of the land could be expected. One witness, an experienced appraiser, estimated that the property as of April 1952, assuming the pits to be filled with garbage in some places and solid fill in others and with a 6-foot overburden, would have a value of approximately $3,000 per acre, or $265,000. The witness explained that the property could not have been used for the above-described purposes when unfilled and hence would have greater utility after filling. His estimate was based in part on other sales of land in the vicinity in the years near 1952, which were made at prices ranging from $3,700 to $7,000 per acre. One difficulty with these comparison sales is that we are without clear descriptions of the land and the surrounding factors which may have influenced the sales. Also, those relied upon range from one-half acre to approximately 9 acres and form no convincing evidence of what the petitioner's 88 acres might in 1952 be reasonably estimated to be worth when filled in 1960 or 1965.

One of the witnesses for the petitioner, an experienced appraiser of real property in the area, reported that certain other sales indicate a considerably lower value per acre for larger tracts of unimproved land in the vicinity of the petitioner's dump. From these sales, and considering the limited usefulness of a filled dump for industrial purposes, he concluded that the petitioner's property, when completely filled, would have only a nominal value and that the value of virgin land in that area, zoned heavy industrial, as of 1952 was $500 per acre.

The respondent points to the petitioner's purchase in 1954 of 176

lots of vacant land near the east hole for $38,000, or some $3,000 per acre, as contradicting the petitioner's estimate. This land had been platted as a subdivision and water and sewer lines were installed. The petitioner was buying this as lots for the purpose of preventing the sale of lots to homebuilders who might be able to stop his operation of the dump as a nuisance. For this protection he was willing to pay more than this land was worth, as vacant land.

The Illinois Brick Co., at the time of the sale to the petitioner, offered to exclude a small parcel at a price of $500 per acre. This and other evidence tends to show that the petitioner's estimate in 1952 of the ultimate salvage or remaining value of the property was not unreasonable.

The calculation of a reasonable salvage or remaining value of $44,000 for the land leaves $106,000 as representing petitioner's investment in space for dumping to be depreciated.

At the time of his purchase of the property in 1952, the petitioner had a survey made to determine the amount of space available for his dumping operations. The quantity was found to be 2,528,787 cubic yards. The allocated price of $106,000, divided by the quantity, indicated a charge of about 4.19 cents per cubic yard as the measure of the chargeoff. The petitioner had his employees record the quantity dumped each day by his customers and kept track of the total number of cubic yards deposited. Because of compaction after dumping, the yards dumped were not an accurate measure of the space consumed. He had another survey made at the end of the fiscal year ending in 1957, and another survey 1 year later to determine the amount of space remaining. This gives an accurate computation of the space used in the last year before us. The quantity of compacted fill deposited in the fiscal year ended in 1958 is stipulated as 330,406 cubic yards. The quantities now claimed for the 2 preceding years were computed by the petitioner's accountant from the surveys and truck records. We see no reason to question this computation.

The petitioner claimed deductions as for depletion in the fiscal year ended in 1956 and for amortization in the succeeding fiscal years. In the circumstances it is understandable that there was uncertainty in the basis of the claims. We hold that he is entitled to deductions for depreciation by reason of exhaustion of the space purchased for use in his business.

There is an error in the petitioner's calculation as to the fiscal year ended in 1956. For that year he claimed a deduction in the amount of $9,921.46. His later computation, appearing in his return for the year ended in 1958, represents that the amount claimed in the 1956 year was $6,908.28 for 164,678 cubic yards. This would appear to be

the correct amount to be allowed for 1956. The correction may be made pursuant to Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DRENNEN, *J.*, dissenting: I am entirely sympathetic with the result reached by the majority but I find difficulty in finding a provision in the law which allows the deduction, which, of course, is a matter of legislative grace. *New Colonial Ice Co.* v. *Helvering*, 292 U.S. 435. While the term "exhaustion" used in section 167 taken out of context might well be applied to eliminating air from this hole in the ground, I do not believe the space created by the hole is depreciable property within the meaning of that section. In my opinion the property involved was nondepreciable land as would have been the case had petitioner bought a tract of barren land with a natural ravine running through it.

TIETJENS, PIERCE, MULRONEY, and TRAIN, *JJ.*, agree with this dissent.