GOLDEN GATE DISPOSAL COMPANY, WEST COAST SALVAGE COMPANY, WESTERN CONTAINER COMPANY, and MACOR INCORPORATED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SUNSET SCAVENGER COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Golden Gate Disposal Co. v. Commissioner
Docket Nos. 10802-76, 10803-76.[1]
United States Tax Court
T.C. Memo 1979-199; 1979 Tax Ct. Memo LEXIS 325; 38 T.C.M. (CCH) 835; T.C.M. (RIA) 79199; May 21, 1979, Filed *325 Petitioners terminated refuse disposal operations on their space for dumping. Thereafter, they held the space for dumping for sale. Held, they are not entitled to either an abandonment or retirement loss deduction. Charles A. Lane, for the petitioners. Eugene E. Ciranni, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Fiscal Year
Deficiency
10802-76
September 30, 1972
$231,084.48
10803-76
September 30, 1972
260,025.84
*326 We must decide whether petitioners are entitled to either an abandonment or retirement loss deduction under section 165(a)[2] with respect to their space for dumping refuse. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. Golden Gate Disposal Company (hereinafter Golden Gate) and Sunset Scavenger Company (hereinafter Sunset) maintained their principal offices in San Francisco, California, when they filed their returns with the Internal Revenue Service at Fresno, California, and when they filed their petitions in this case. Both California corporations are in the refuse collection business. Golden Gate and Sunset each own 49 percent of the stock of Sanitary Fill Company (hereinafter Sanitary Fill), a corporation organized to dump the refuse collected by them. Sanitary Fill performed its services for a fee based on the volume of refuse supplied by petitioners. In 1962 and 1963 Golden Gate and Sunset purchased 283 acres of tide and marsh land (hereinafter Sierra Point property) on the San Francisco Bay as a site for refuse disposal. The land was under water *327 at high tide. As a condition to dumping refuse on the submerged land, the California State Water Quality Control Board, the United States Army Corps of Engineers, and the City of Brisbane all required that a dike surrounding the disposal site be constructed and maintained in order to prevent the refuse from polluting San Francisco Bay and the leaching or mixing of salt water with the refuse fill. Without a dike, the action of the waves, winds, and tides in the San Francisco Bay would erode the land and wash it away. Construction of the dike with an access road commenced in July of 1964 and was completed in August or September of 1965. Golden Gate and Sunset maintained asset accounts for the dike and access road separate and distinct from the asset accounts for the land. Approximately 129 acres were enclosed by the dike (hereinafter the Sierra Point site). Sanitary Fill began dumping refuse on the Sierra Point site in November 1966 and continued to do so until December 31, 1970, when they suspended operations for a number of reasons. In September of 1971 petitioners decided to terminate their refuse disposal operations at the Sierra Point site effective December 31, 1971. *328 Since that time no refuse has been dumped on Sierra Point because: (1) the City of Brisbane and its citizens objected to the use of Sierra Point as a refuse disposal site; (2) the environmentalists and environmentalist agencies in the San Francisco Bay areas also objected to using Sierra Point as a refuse disposal site; (3) Golden Gate, Sunset, the City of Brisbane, and others negotiated an agreement legally restraining the use of Sierra Point for refuse disposal purposes after December 31, 1971. In December 1970, petitioners retained a real estate broker to sell the Sierra Point property which could no longer be used for refuse disposal. He procured several prospective purchasers, but none of the deals was closed. Petitioners continued holding the land for sale at the time of trial. In their fiscal years ending September 30, 1972, Golden Gate and Sunset each claimed an abandonment loss deduction equivalent to one-half of the cost of the dike with access road. The deduction claimed by each amounted to $541,720. Respondent determined that petitioners were not entitled to the claimed abandonment loss deductions under section 165(a). OPINION We must determine whether petitioners *329 are entitled to a loss deduction in their taxable years ending September 30, 1972, when they terminated their refuse disposal operations at the Sierra Point site. Petitioners collect garbage and refuse which is dumped by Sanitary Fill, their wholly owned subsidiary. Petitioners purchased the Sierra Point site for refuse disposal; but, in order to satisfy various governmental requirements, they constructed a dike with an access road to prevent refuse dumped at the site from polluting San Francisco Bay. In the course of business the space inside the dike was to be gradually filled. When this process was completed the land and dike would be of no further use in the business. Petitioners contend that they purchased and constructed a space for dumping, not land and improvements. As such, they argue that they are entitled to a loss deduction for the space for dumping when they terminated its use in their business. They rely upon either the abandonment loss provisions of section 1.165-2(a), Income Tax Regs., or the retirement loss provisions of section 1.167(a)-8, Income Tax Regs., as authority for their deduction. Respondent *330 contends that the only asset purchased at the Sierra Point site was land; that the dike with access road was merely an improvement of that land; and that the land was not abandoned since it was held for sale. As such, he argues petitioners are not entitled to any deduction until the land is sold when the loss, if any, is sustained in a closed transaction. After a careful review of the record before us, we find that petitioners are not entitled to any loss deductions with regard to their space for dumping; however, we decline to follow respondent's theory in so finding. Specifically, we find that petitioners did in fact purchase and construct an asset separate and distinct from the land and dike with access road -- the space for dumping. Nevertheless, since we find that petitioners have neither abandoned nor retired that asset, they are not entitled to their claimed loss deductions. As noted, we believe the space contained in the dumping area is a property right separate and distinct from the Sierra Point land and dike with access road. We have previously addressed such an issue. In Sexton v. Commissioner,42 T.C. 1094 (1964), we recognized that *331 a taxpayer may have an investment in a particular feature of real property that is separate and distinct from its investment in the land and may be treated separately for tax purposes. In Sexton, the taxpayer, as petitioners here, was engaged in the business of refuse disposal. The taxpayer purchased land containing space for dumping. We held that the space for dumping was a separate asset from the land purchased and, on the basis of the record, found that the taxpayer was entitled to depreciate his diminishing investment in the space under section 1.167(a)-3, Income Tax Regs.
Unlike petitioners who were required to improve their land with a dike and access road to have a usable space for dumping, the taxpayer in Sexton purchased land already containing such space. We see, however, no economic difference between the two factual patterns. The object and purpose in both Sexton and this case was to obtain a usable space for dumping refuse. Accordingly, on the basis of our record, we find that petitioners *332 have a separate depreciable asset in their space for dumping. [3]
Our finding, however, does not automatically entitle petitioners to their claimed deductions. Unlike Sexton wherein the taxpayer sought only to depreciate its space for dumping, petitioner sought only to depreciate its space for umping, petitioners here seek an abandonment or retirement loss for their space for dumping -- a point clearly not addressed in Sexton. We find that although petitioners have an asset capable of being retired, our record clearly demonstrates that it was not. Our finding, under the theory of Sexton, that petitioners' space for dumping is a separate depreciable asset, precludes their attempt to claim an abandonment loss. An abandonment loss is sustained when nondepreciable property is abandoned. Section 165(a) and *333 section 1.165-2(a), Income Tax Regs. But one of the methods of retiring depreciable property, as discussed below, is by actual physical abandonment which retirement is likewise deductible under section 165(a). Petitioners argue in the alternative that since they terminated refuse disposal operations on the space for dumping they are entitled to a retirement loss deduction. On the basis of our record, we do not believe that they "retired" the space from use in their trade or business. Section 1.165-2(c), Income Tax Regs., refers to section 1.167(a)-8, Income Tax Regs., for the allowance under section 165(a) of losses arising from the permanent withdrawal [abandonment] of depreciable property. Section 1.167(a)-8(a), Income Tax Regs., provides the following with respect to a retirement loss deduction under section 165(a): For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or *334 in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. The tax consequences of a retirement depend upon the form of the transaction, the reason therefor, the timing of the retirement, the estimated useful life used in computing depreciation, and whether the asset is accounted for in a separate or multiple asset account. Upon the retirement of assets the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss. [Emphasis added.] Whether a depreciable asset has been actually retired from a taxpayer's business is a question of fact. Mere nonuse of property in the trade or business, however, does not constitute retirement entitling a taxpayer to a loss deduction. United California Bank v. Commissioner,41 T.C. 437, 451-452 (1964), *335 affd. per curiam 340 F. 2d 320 (9th Cir. 1965). As noted by the above quoted portion of section 1.167(a)-8(a), Income Tax Regs., retirement of a depreciable asset may occur in several ways -- all constituting a permanent withdrawal from use in the trade or business. Of relevance here are actual physical abandonment and sale or exchange.Retirement by sale or exchange precludes retirement by physical abandonment since the latter implies the taxpayer intends to irrevocably discard the asset so that it will neither be used by him nor retrieved by him for sale, exchange, or other disposition. If the taxpayer is retiring the asset by sale or exchange, gain or loss may only be recognized in the year of sale. Mere nunuse of depreciable property in a trade or business does not constitute a retirement by physical abandonment. All the circumstances surrounding the use of the asset must be examined. Thus, petitioners' mere termination of refuse disposal would not constitute a physical abandonment of the space for dumping if it was held for sale. Our *336 careful review of the record leads us to conclude that they held the space for dumping for sale which precludes their physical abandonment argument. The record clearly demonstrates that the Sierra Point site was being held for sale on September 30, 1972. This included the land, dike with access road, and space for dumping. Although the space for dumping is a separate asset for tax purposes, its nature is such that it is sold with the underlying land and dike with access road unless the vendor and vendee agree otherwise. The record does not reflect that petitioners made any attempt to carve out the space for dumping from the land for purposes of sale. Accordingly, we conclude that the space for dumping was being held for sale with the land and dike with access road. As such, it would be transferred to the vendee with the improved real estate. Therefore, petitioners must await the year of sale to recognize their loss, if any. To reflect the foregoing, Decisions will be entered for the respondent.
Footnotes
1. These cases were consolidated by joint motion of the parties for purposes of trial, briefing, and opinion.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. Since we find that petitioners are not entitled to loss deductions because they have not abandoned or retired the space for dumping, we see no need to find the precise depreciable basis of the space. See Sexton v. Commissioner,42 T.C. 1094↩ (1964).