H. KENDRICK SANDERS AND BARBARA F. SANDERS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

F. BRUCE BACH AND BEVERLY J. BACH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9622–77, 9623–77.     Filed October 21, 1980.

*Wayne M. Bach*, for the petitioners.
*John S. Ball* and *Michael R. Moore*, for the respondent.

FORRESTER, *Judge:* In these consolidated cases respondent has

---

determined deficiencies in petitioners' Federal income tax as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| H. Kendrick Sanders and Barbara F. Sanders ...... | 9622–77 | 1973 | $1,397 |
|  |  | 1974 | 1,106 |
| F. Bruce Bach and Beverly J. Bach ........... | 9623–77 | 1973 | 1,445 |
|  |  | 1974 | 1,348 |

The sole issue for decision is the proper characterization of amounts paid by petitioners' partnership for the right to dump fill dirt on property which the partnership had contracted to purchase, where such payments were credited against the purchase price of the property.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners H. Kendrick Sanders and F. Bruce Bach were at all relevant times partners in the law firm of Gilliam, Sanders & Bach in Fairfax County, Va. They filed joint income tax returns with their spouses for taxable years 1973 and 1974 with the Internal Revenue Service Center in Memphis, Tenn. Barbara F. Sanders and Beverly J. Bach are parties to this proceeding solely by virtue of having filed joint income tax returns with their husbands and, consequently, H. Kendrick Sanders and F. Bruce Bach will hereinafter be referred to as petitioners.

During 1972, petitioners' law firm represented E & R Trucking Co., Inc. (hereinafter referred to as E & R), a large hauling business in northern Virginia. E & R was under contract to the Washington Metro Subway (hereinafter referred to as Metro) to haul dirt and other debris from the Metro excavation. Because fees charged haulers to dump fill were approximately $5 per load (7½ cubic yards), E & R sought land upon which to operate its own landfill business less expensively. A suitable plot of ground was located and lengthy negotiations began in an effort to obtain rights to use the property for fill purposes. The land was easily accessible—adjacent to I-95—and of a size and shape that could hold a great deal of dirt. This property was owned by the heirs of James O'Neill (hereinafter the O'Neill tract). The

O'Neill heirs insisted upon selling the property. Wanting primarily to use the property and not to buy it, but being in a hurry to secure the land since E & R's Metro contract was already in force, a decision was made to purchase the O'Neill tract.

The purchaser was a joint venture operating as Lorton Development Associates (hereinafter referred to as Lorton or as purchaser). Petitioners each owned a one-sixth interest in Lorton. The other two-thirds was owned one-third by E & R, one-sixth by Robert L. O'Neill, and one-sixth by J. William Gilliam. This joint venture was formed for the following express purposes: (1) To purchase the O'Neill tract; (2) to clear and operate fill operations thereon; and (3) to secure suitable rezoning of this land.

The contract purchasing the O'Neill tract was executed on behalf of Lorton by Herbert G. Risse, trustee, on January 31, 1973. Final settlement was contingent upon appropriate rezoning to be secured by the purchaser and upon satisfactory results in engineering studies indicating that the property would be suitable for the purchaser's business. H. Kendrick Sanders considered it highly unlikely that the zoning contingency would be met. Because of this, he felt that Lorton could avoid the contract at a later date if it so desired. Lorton had 2 years to meet the contingencies provided in the contract. In the meantime, Lorton had an immediate right to enter onto the O'Neill tract and to operate a landfill business. Lorton was required to pay the O'Neill heirs $2 for each 7½-cubic-yard load of dirt deposited on the O'Neill tract. This $2 fee was then credited toward the $392,800 contract price.

Throughout 1973 and 1974, Lorton filled the O'Neill tract with dirt, cement, and similar debris dumped on the property by E & R. E & R managed the landfill operation for a fee from Lorton of $1,000 per month. E & R paid Lorton $3.25 for each load dumped, of which Lorton in turn remitted $2 to the sellers of the O'Neill tract. In June 1974, E & R agreed to manage the entire O'Neill tract for no fee. E & R could, however, accept fill from other haulers at the substantially higher market rates, while they were required to remit only $3.25 per load to Lorton.

Lorton paid the sellers of the O'Neill tract $28,226 in 1973 and $24,088 in 1974 for fill deposited on the land.

In January 1975, Lorton was formally dissolved. A new partnership was then formed called Lorton Road Associates. The

partners were E & R, Robert O'Neill, and GSB, Inc. (GSB). GSB was owned by Gilliam and petitioners. Petitioner Sanders was president of GSB. In August 1976, Lorton Road Associates was incorporated as Lorton Road Associates, Inc. (hereinafter Lorton, Inc.).

From 1973 through 1976 Lorton, Lorton Associates, and Lorton, Inc. (hereinafter collectively referred to as Lorton), continued to benefit from the use of the O'Neill tract. Lorton unsuccessfully sought to rezone the tract for townhouses, as provided in the purchase contract; however, it did ultimately receive a change to light industrial zoning. By 1977, the O'Neill tract became loaded to capacity with fill. A private appraisal of the tract in March 1977 valued it at between $235,500 and $275,000. Another appraisal by Fairfax County, following an appeal from an assessed value of $490,930, valued it at $294,560. Total dump fees paid to the O'Neill heirs amounted to $131,450, which had been credited to Lorton's account. Since the net balance due on the O'Neill tract was $261,350, Lorton elected to proceed to settlement[1] in early 1977.

For taxable years 1973 and 1974, the Lorton joint venture deducted dump fees of $28,226 and $24,088, respectively, from ordinary income. The petitioners carried their portion of these deductions through onto their personal returns for those years.

Respondent has determined that the dump fees paid constitute nondeductible capital expenditures. The asserted deficiencies in petitioners' income taxes for 1973 and 1974 result from such adjustments made to the partnership returns.

## OPINION

Petitioners have advanced several arguments in support of their claimed deductions for the dump fees paid. These may be summarized as follows:

(1) The dump fees are ordinary and necessary business expenses deductible under section 162;[2]

---

[1]Since the zoning contingency in the contract was not met, Lorton apparently could have avoided the contract.

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.

(2) The dump fees are deductible from gross receipts as cost of goods sold;

(3) The dump fees are the partnership's basis in determining capital gain; and

(4) The partnership should be allowed unit depreciation at a rate equal to the dump fees paid.

The respondent disputes each of these arguments and asserts that the payments represent a nondeductible, nondepreciable interest in land.

## *Section 162 Deduction*

Petitioners maintain that the partnership was carrying on a trade or business and that the dump fees were ordinary and necessary expenses in furtherance thereof. They liken the payments to rent. Respondent does not dispute that Lorton was carrying on a trade or business nor that the expenses were necessary thereto. Respondent argues, however, that section 162[3] is not applicable since the expenditure was capital in nature. See sec. 263(a)(1). Respondent contends that the payments were not rent for the use of property but, on the contrary, were part of the purchase price of property. We must agree with respondent's view.

Section 162 specifically excludes from its coverage rent-like payments for property in which the taxpayer has taken or is taking title or for property in which the taxpayer has an equity interest. Sec. 162(a)(3). In the instant case, the payments made by the petitioners were credited against the purchase price of the O'Neill tract. This fact is not determinative that a sale as opposed to a lease existed. Petitioners would have us consider the contract of sale as actually two contracts; one for the mere use of property and one for the purchase of property. We must concentrate upon the substance of the transaction in light of the agreement pursuant to which the payments were made. See

---

[3]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.— There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

*       *       *       *       *       *       *

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

*Thompson v. Commissioner*, 73 T.C. 878, 890 (1980); *Smith v. Commissioner*, 51 T.C. 429, 438–439 (1968). The instant agreement makes crystal clear that the payments were part of the purchase price. The contract is one for the sale of land—it purports to be nothing else, not even a lease coupled with an option to purchase. See *Oesterreich v. Commissioner*, 226 F. 2d 798, 801–802 (9th Cir. 1955). The fact that the sellers of the O'Neill tract refused to lease the property, thus making petitioners' use of it impossible absent the purchase contract, is not of consequence.[4] The petitioners are attorneys and as such were clearly aware of the nature of the contract. Additionally, the joint venture agreement stated that purchase of the property was one of its purposes. That significant contingencies were placed in the contract which would allow the petitioners to avoid it makes the document no less a contract. By the very terms of that contract, once the petitioners dumped the first load of fill on the O'Neill tract they had an equity interest in the land. Furthermore, as contract purchasers, they held equitable title to it. Thus, petitioners have failed to meet the requirements of section 162(a)(3).

### Cost of Goods Sold/Capital Gains

Petitioners next would have this Court consider the $2 per load paid to the O'Neill heirs either cost of goods sold—a deduction from gross receipts in determining gross income—or as basis in determining gain on the sale of each 7½ cubic yards of space consumed. On the facts presented we find these arguments totally without merit. Before we can reach either of these arguments, the petitioners must prove that there was a sale or exchange. See sec. 1222; sec. 1.61–3(a), Income Tax Regs.; Rule 142(a), Tax Court Rules of Practice and Procedure. No such sale has been shown by petitioners. Lorton was not selling interests in the O'Neill tract. The businesses which dumped fill on the land—E & R during the years in issue—acquired no rights in the land in exchange for the fee paid to Lorton. Lorton was merely using its land and the air rights appurtenant thereto.

---

[4] See *Hill v. Commissioner*, T.C. Memo. 1979–103.

## Depreciation of the Air Rights

Petitioners' final argument, and the only one with which we find merit, is that Lorton is entitled to unit depreciation for the air space exhausted in the operation of the dump site.

Section 167(a)[5] permits the deduction of a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the taxpayer's trade or business. Petitioners have the burden to prove a depreciable interest in the property and that an economic loss will be suffered through use. *Geneva Drive-In Theatre, Inc. v. Commissioner*, 67 T.C. 764 (1977).

It has long been the position of this Court that air above land may constitute a property right separate from the land itself. *Sexton v. Commissioner*, 42 T.C. 1094 (1964); *Fair v. Commissioner*, 27 T.C. 866, 872 (1957).[6] In *Sexton v. Commissioner, supra*, the taxpayer sought to depreciate air rights consumed in the operation of a garbage dump on land purchased for that purpose. The site was a manmade excavation created by the digging of clay for bricks prior to the time that the taxpayer acquired the land. Records were kept of the amount of space utilized each year through annual surveys. This Court held that "Since rights in space have been recognized as property subject to transfer separately from the related land, we perceive no reason why such rights should not be the subject of depreciation as wasting assets in the business of this taxpayer." (42 T.C. at 1102.) The Court in *Sexton* allowed unit depreciation since the taxpayer had proved the amount of space exhausted each year and the value of each cubic yard of space consumed.

The respondent argues that a fatal difference exists between *Sexton* and the instant litigation since the O'Neill tract was not purchased *solely* for use as a dump site. Respondent concedes that such a use was "an important consideration in the selection" of the O'Neill tract, but argues that the petitioners' development motive precludes the *Sexton* exception to the general rule that

---

[5]SEC. 167. DEPRECIATION.

(a) General Rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

[6]See *Golden Gate Disposal Co. v. Commissioner*, T.C. Memo. 1979–199.

land is not depreciable. We disagree. The facts make it abundantly clear that petitioners' overwhelming purpose in the acquisition of the O'Neill tract was for use as a dump site. They never would have purchased it had they been able to lease it. Respondent argues that petitioners' attempt to rezone the O'Neill tract indicates a development purpose. We think it only reasonable that petitioners would want to increase the residual commercial attractiveness of the O'Neill tract for sale or development once it was no longer useful as a dump site.

Respondent argues further that the instant case differs from *Sexton v. Commissioner, supra,* since the O'Neill tract was not a manmade excavation. This is a distinction without a difference. It is clear that the O'Neill tract was particularly well suited for a dump site due to its size, location, and shape. We see no real difference between the two factual patterns. In both situations, the primary objective of the purchase was to acquire usable space for dumping. The holding in *Sexton* did not depend upon a manmade excavation nor, in fact, any excavation. Of primary importance there, was that the property was purchased for use as a dump site. Air rights may be a separate property right from the land whether the property is flat or concave. See *Fair v. Commissioner, supra.*

Respondent also maintains that Lorton did not hold a depreciable interest in the O'Neill tract because it was merely a contract vendee under an executory contract of sale. It appears that respondent wants to have its cake and eat it, too. That is to say, respondent maintains that, for purposes of section 162, petitioners are the owners of the O'Neill tract, but for purposes of section 167, they are not.

Whether one has a depreciable interest in property is a question of fact to be decided upon all of the facts presented. The depreciation deduction may be taken by the party who will suffer the economic loss in value through use, exhaustion, etc. *Weiss v. Weiner,* 279 U.S. 333 (1929). Control, possession, and title are the primary factors. See Rev. Rul. 69–89, 1969–1 C.B. 59. The facts of the instant case clearly show that Lorton had sole control and possession of the O'Neill tract. Upon execution of the purchase contract, Lorton entered onto the land and began operating its dumping business which it continued to do throughout the years in issue. Any diminution in the value of the land consequent to that operation fell upon Lorton. Lorton had

entered into an enforceable contract to purchase the O'Neill tract at a purchase price of $392,800. Lorton was bound to pay that amount regardless of the effect on value thereof caused by the dumping. Since the burden of the economic loss to the property would be borne by Lorton, so the allowable depreciation could properly be deducted by it.

Finally, respondent contends that petitioners have not sustained their burden of proof as to the allowable amount of depreciation or of providing evidence from which depreciation may be calculated. Petitioners claim that the $2 fill fee is the appropriate measure of depreciation. Although the amount paid on the O'Neill tract is irrelevant to the question of depreciation, we believe that petitioners have presented evidence from which the appropriate deduction may be calculated.

The proper measure of depreciation in the instant case is the unit depreciation method. See *Sexton v. Commissioner, supra.* Petitioners must prove the diminution in value caused by dumping, and the total number of 7½-cubic-yard units of capacity on the O'Neill tract. With these figures, we may calculate an appropriate amount of depreciation per unit. By multiplying depreciation per unit times the number of units dumped in 1973 and 1974, we will arrive at the appropriate depreciation deductions for those years.

The contract provided a purchase price of $392,800. After the property was filled, the O'Neill tract was appraised by a private appraiser at between $235,500 and $275,000. This appraisal was commissioned by Lorton for the purpose of deciding whether to go through with the purchase for an additional $261,350. Shortly thereafter, Fairfax County informed Lorton that for real estate tax purposes the land was valued at $490,930. Pursuant to an appeal from this amount, the assessed value was reduced to $294,560. The reason for the apparently low values in both appraisals was the sizable mound of fill on the O'Neill tract. We find that the value of the tract at the time it was filled was $261,350—the amount which Lorton actually paid to acquire full legal title. Thus, the diminution in value of the property resulting from the dumping operation was $131,450 ($392,800 - $261,350).

H. Kendrick Sanders testified that in 1977 when the O'Neill tract was full, for dumping purposes, a total of 65,725 loads had been dumped. Although no surveys had been taken, as was the

case in *Sexton v. Commissioner, supra,* the fill in the instant case—dirt, concrete, and asphalt—was not highly compactable. By contrast, in *Sexton,* surveys were essential since the ordinary garbage that was dumped was significantly compacted. Unlike *Sexton,* in the instant case, the number of loads dumped is an excellent measure of the space exhausted. The depreciation per load unit, therefore, was $2 ($131,450 ÷ 65,725).

The parties have stipulated that Lorton paid the O'Neill heirs $28,226 and $24,088 in 1973 and 1974, respectively, as dumping fees. They have further stipulated that Lorton paid $2 for each load dumped. This translates into 14,113 and 12,044 loads dumped, respectively, in 1973 and 1974. At $2 depreciation per load, we find that Lorton is entitled to depreciation deductions for 1973 in the amount of $28,226, and for 1974 in the amount of $24,088. Based on the foregoing,

*Decisions will be entered for the petitioners.*