BROWNING-FERRIS INDUSTRIES, INC., AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Browning-Ferris Industries, Inc. v. Commissioner
Docket No. 10719-84.
United States Tax Court
T.C. Memo 1987-147; 1987 Tax Ct. Memo LEXIS 145; 53 T.C.M. (CCH) 397; T.C.M. (RIA) 87147; March 19, 1987. Charles Hall and William S. Lee, for the petitioners. Marion Friedman and David H. Peck, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency of $376,776 in petitioners' Federal income tax for the tax year ending September 30, 1977. After concessions, the issues remaining for decision are: (1) whether petitioners are entitled to depreciation deductions in the operation of two landfills; and (2) if so, whether petitioners have provided sufficient evidence from which the deductions for depreciation can be calculated. Browning-Ferris Industries, Inc. (BFI or petitioner), a Delaware corporation with its principal office at all relevant times in Houston, Texas, is the parent of an affiliated group of corporations which are primarily *147 engaged in the business of collecting, processing and disposing of solid and liquid wastes. The affiliated group maintains its books and files its consolidated income tax returns using the accrual method of accounting. Petitioner's waste collection and disposal business was commenced in 1967 with two or three garbage trucks. It was then known as American Refuse Systems, Inc. ("ARS"). In 1969, ARS acquired control of a heavy equipment company, Browning-Ferris Machinery; changed its name to Browning-Ferris Industries, Inc.; placed the new company in the waste business; and caused it to acquire waste collection companies and landfill operations throughout the United States. In 1971 and 1972 ARS transferred all of its assets to the new company in exchange for stock and dissolved, thereby leaving the entire operation in BFI, petitioner herein. By 1977, the year in issue, petitioner's waste business had become an international operation with an annual revenue of approximately $300,000,000. During the year ending on September 30, 1977, petitioner and one of its subsidiaries [1] owned and operated two landfills in the Houston area. One was located on Holmes Road ("Holmes site") and *148 consisted of 19 tracts of flat land which had been acquired by petitioner from 1971 through 1975 for the sole purpose of using the tracts in the operation of a landfill. The site is interlaced with above-ground and below-ground oil pipelines. It is also subject to both pipeline and power line easements and contains both producing and abandoned oil wells. Only four tracts were used by petitioner in 1977 and certain detail with respect to them apears in the following schedule: Tract
Description/
Total Acreage
Purchase
Number
Asset No.
of Tract
[2] Cost Date
11
Settegast
13.3145
$ 70,352
12/21/71
15
Fordyce
44.9571
370,077
1/4/74
16
Settegast
9.8015 65,034
1/16/74
17
Fordyce
7.0000 48,960
2/4/75
TOTAL
75.0731
$554,423
The second landfill was located *149 on McCarty Road (McCarty site) and consisted of 5 tracts of flat land acquired by petitioner from 1971 through 1974 for the sole purpose of using them in the operation of a landfill. Only two tracts were used by petitioner in 1977 and certain detail with respect to them appears in the following schedule: Total Acreage
Purchase
Tract
of Tract
[3] Cost Date
100-acre Mosher
100.00 $ 594,267
12/24/71
109-acre Mosher
Tract
109.311
669,026
1/21/74
209.311
$1,263,293
In February of 1972, petitioner was granted permission by the Texas Department of Health ("TDH") to dump waste on both of the McCarty tracts. However, by 1974 state regulation of landfill operations had become more stringent and all landfill operators in Texas were required to apply for new operating permits. Consequently in 1975, petitioner filed with TDH an application for permission to continue dumping waste at the McCarty site and an application to commence dumping waste at the Holmes *150 site. After a public hearing TDH issued to petitioner on April 14, 1976, Permit No. 261 for the McCarty site which provided that "This permit will be valid until cancelled or revoked by the Director of the Texas Department of Health Resources or until the site is completely filled and rendered unusable, whichever occurs first." After two public hearings TDH issued on January 27, 1976 Permit No. 38 which authorized petitioner to conduct a landfill operation at Holmes for a two-year period. With respect to each of the above applications, petitioner prepared and submitted to TDH an engineering design which reflected the planned depth, heighth and capacity of the fill covered by the application. By taking into consideration the existing easements, pipelines and oil wells as well as the required set-backs from property boundaries, petitioner estimated in its applications that the fill capacity of the Holmes site was 6,915,000 gate yards of waste [4] and the remaining capacity at the McCarty site was 24,240,000 gate yards of waste. After the permits were granted, petitioner commenced waste operations at Holmes and *151 continued such operations at McCarty by using at both sites a combination of two methods of waste disposal, i.e., the progressive trench method and the aerial disposal method. Under the first method petitioner would excavate a trench to a depth of 10 feet at Holmes and 20 feet at McCarty, with the excavated soil being piled along the sides of the trench. Waste was then dumped from trucks into the trench and at the end of each day a layer of soil was placed over the waste in order to form a series of waste cells. Since the waste included household garbage, sewage sludge, and plant matter such as leaves and brush, the use of the cells tended to control rodents, flies, odors and the scattering of the waste materials by wind or rainfall. Once a trench was filled to ground level, the aerial method of waste disposal commenced. It is similar to the progressive trench method except that the daily cells of waste are formed into a mound above ground. After a mound reached a height of approximately 20 feet at Holmes and 40 feet at McCarty it was capped with a two-foot clay cover and graded to a 2 percent slope from the center to each side at Holmes and a 1 percent slope at McCarty. To *152 further prevent erosion, top soil was placed over the clay cap and vegetation was planted over the length and breadth of each mound. Once a trench and its overlaying mound were completed the entire process was repeated at an appropriate distance from the first by the excavation of a new trench and when it was full by the construction of another overlaying mound. Again and again the two processes were to be repeated until the entire site was filled. During the year ending on September 30, 1977, petitioner dumped 4,360,690 gate yards of waste at Holmes and 3,124,164 gate yards of waste at McCarty. For the 1977 fiscal year petitioner claimed depreciation deductions with respect to both sites of $421,524 ($305,923 for Holmes and $115,601 for McCarty). The deductions were computed as follows: Four Holmes
Two McCarty
Road Tracts
Road Tracts
a. Cost
$554,423
$1,263,293
b. Completed Value
69,303
366,355
c. Depreciable basis (a. less b.)
485,120
896,938
d. Waste dumped during fiscal
1977 (gate yards)
4,360,690
3,124,164
e. Total Capacity of full gate yards
6,915,000
24,240,000
f. Portion depreciable during fiscal
1977 (d. divided by e.)
.6306131
.1288846
g. Deduction for fiscal 1977 (c.
multiplied by f.)
$305,923
$ 115,601
*153 OPINION Respondent contends that no part of the space utilized by petitioner in its landfills qualifies as depreciable property. Petitioner contends that it is entitled to unit depreciation on the space exhausted in the operation of the Holmes and McCarty landfills. We agree with petitioner. Under section 167(a)[5] a depreciation deduction is permitted for a reasonable allowance for the exhaustion, wear and tear, or obsolescence of property used in a taxpayer's trade or business. The burden is on the taxpayer to establish that he has a depreciable interest in the property. Geneva Drive-In Theatre, Inc. v. Commissioner,67 T.C. 764 (1977) affd. 622 F.2d 995 (9th Cir. 1980; Rule 142(a).[6]
*154 Land as such is not a depreciable asset for tax purposes. See, e.g., Houston Chronicle Publishing Co. v. United States,481 F.2d 1240, 1258 (5th Cir. 1973), cert. denied, 414 U.S. 1129 (1974). However, space in, on, or above land may constitute a property right which is separate from the land itself and as such may qualify for depreciation. Sexton v. Commissioner,42 T.C. 1094 (1964); Fair v. Commissioner,27 T.C. 866, 872 (1957)[7]. In Sexton v. Commissioner,supra, the taxpayer sought to depreciate space consumed in the operation of a garbage dump on land purchased for that purpose. The space on which depreciation was sought was a pit which had been excavated in the land by a former owner in order to obtain clay for the production of bricks. The taxpayer paid more per acre for the excavated land than it would have paid if the land had been level. The taxpayer was able to establish through annual *155 surveys the amount of space in the pit which was utilized each year in its garbage business. We concluded that "[s]ince rights in space have been recognized as property subject to transfer separately from the related land, we perceive no reason why such rights should not be the subject of depreciation as wasting assets in the business of this taxpayer." 42 T.C. at 1102. We also concluded in Sexton that unit depreciation was allowable to the extent of the difference in the purchase price of the excavated land and "the salvage, or remaining value of the land, when no longer useful in [the taxpayer's] business * * *." More recently, in Sanders v. Commissioner,75 T.C. 157 (1980), we concluded that a partnership which had purchased real property for use as a landfill had acquired a depreciable interest and was entitled to deductions for unit depreciation on the space exhausted in its dumping operation. The land contained no manmade excavation but "was particularly well suited for a dump due to its size, location, and shape." It was utilized as a deposit *156 for dirt, rock and other debris removed from the excavations for the Washington Metro Subway. Once the dumping operations were completed, a "sizable mound" of fill existed on the land and caused it to be reduced in value. In Sanders, respondent argued that the facts were different from those confronted in Sexton since the Sanders tract did not contain a manmade excavation. With regard to this argument we stated: This is a distinction without a difference. It is clear that the O'Neill tract was particularly well suited for a dump site due to its size, location, and shape. We see no real difference between the two factual patterns. In both situations, the primary objective of the purchase was to acquire usable space for dumping. The holding in Sexton did not depend upon a manmade excavation nor, in fact, any excavation. Of primary importance there was that the property was purchased for use as a dump site. Air rights may be a separate property right from the land whether the property is flat or concave. * * * Sanders v. Commissioner,75 T.C. at 164. We again concluded in Sanders that the value of the depreciable interest was the difference *157 between the value of the land prior to the commencement of the dumping operations and the value of the land once the dump site was filled, i.e., the value of the land when no longer useful in the taxpayer's business. In the case before us, petitioner purchased the Holmes and McCarty sites for the sole purpose of acquiring space for dumping waste. Our holdings in Sexton and Sanders did not depend upon whether the space utilized for dumping was "flat or concave" nor did it depend upon the presence of "a manmade excavation nor, in fact, any excavation." We conclude, therefore, that the space acquired and utilized by petitioner for its progressive trench and aerial waste disposal operations constitutes depreciable property. [8]
*158 We also conclude that the proper method of depreciation in the instant case is the unit of production. See Sanders v. Commissioner,supra;Sexton v. Commissioner,supra.Under this method petitioner must establish the diminution in the value of each site which is caused by the dumping, each site's total waste capacity and the amount of waste dumped at each site during the taxable year. Sanders v. Commissioner,supra;Rule 142(a). With these elements the correct amount of depreciation allowable per gate yard of waste can be calculated for each site and with these figures the depreciation deduction allowable for 1977 with respect to each site is merely a matter of multiplying the allowable depreciation per gate yard of waste times the number of such yards dumped at that site during the year. Sanders v. Commissioner,supra.
The parties have stipulated that, based upon the facts and circumstances known by petitioner on the dates the permits were issued with respect to the Holmes and McCarty sites the *159 capacity of Holmes was 6,915,000 gate yards of waste and the capacity of McCarty was 24,240,000 gate yards of waste. The parties have also stipulated that during fiscal 1977, 4,360,690 gate yards of waste were dumped at Holmes and 3,124,164 gate yards of waste were dumped at McCarty. With these stipulations the only other element needed to make the depreciation computation is the diminution in value of each site caused by the dumping of waste, i.e., the depreciable basis of the space available to petitioner at each site for the receipt of waste. In Sanders, we concluded that the diminution in value is the difference in value of the property before the dumping of waste commences and the value of the property when the dumping ceases, i.e., upon termination of the life of the depreciable asset (the space available for the receipt of waste). Respondent contends that petitioner has failed to carry its burden of proof on this element of the computation for two reasons. First, he maintains that the petitioner has failed to establish the end of the useful life of the depreciable asset because *160 the property on which each site is located is still available for useful purposes after the dumping of waste ceases. [9] Consequently, he argues, that no reasonable estimate of salvage value can be made and no depreciable amount ascertained. Respondent misses the mark, however, when he insists that we consider in this case the possible uses of the sites after dumping ceases in order to determine useful life because here we are required to determine the period during which the space available at each site for the receipt of waste may reasonably be expected to be useful to the petitioner for its purposes, i.e., the dumping of waste. Sec. 1.167(a), Income Tax Regs. *161 [10] Obviously this period ends when the space available for waste is filled to capacity. Petitioner estimated the useful life of the space available for waste at the Holmes site to be two years and at the McCarty site to be sixteen years. These estimates were based upon the time limits set forth in the permits issued by TDH as well as engineering analyses of the sites, and petitioner's projection of the number of gate yards of waste to be dumped each day. On this record we find petitioner's estimates of the useful lives to be reasonable. *162 Secondly, respondent contends that petitioner has failed to establish a separate basis for space which it seeks to depreciate. In this connection, section 167(g) reads in pertinent part as follows: The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. Section 1011(a) provides that the adjusted basis shall be the cost of such property as provided under section 1012. [11] or other applicable sections, adjusted as provided in section 1016. *163 Where a taxpayer purchases an aggregate of assets for a lump-sum, the purchase price must be assigned to the different assets which comprise the aggregate purchased. F & D Rentals, Inc. v. Commissioner,44 T.C. 335 (1965). With respect to a lump-sum purchase of both depreciable and nondepreciable assets section 1.167(a)-5, Income Tax Regs., provides: In the case of the acquisition * * * of a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time. * * * In the case before us the purchase prices of the properties on which the dump sites were later located are not in dispute. The parties disagree, however, as to whether any part of the purchase prices is properly allocable to the space used to dump waste and, if so, as to the allocation of the purchase price of each *164 site between the space so used and the underlying land. Respondent notes that all land comes with appurtenant air space and argues that to have a basis independent from the land the appurtenant air space must be purchased for some amount in addition to the cost of the land. More specifically, respondent, relying on our decision in Sexton, argues that petitioner must establish that it paid a premium for the dump sites over and above the cost of similar land and that such premium was attributable to the air space to be utilized for dumping waste. In Sexton the taxpayer paid a premium for the site because the land contained an excavation which could be used for the dumping of garbage. However, the payment of a premium is not necessary for the allowance of depreciation as illustrated by our decision in Sanders where no premium was paid. The similarity in the two opinions is the conclusion in each that the basis for depreciation is the difference between the cost of the property and a reasonable estimate of the value of the land when it is no longer useful for dumping, i.e. *165 , its salvage value. Sexton,supra at 1103, Sanders v. Commisioner,supra at 165. Salvage value is "the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business" Sec. 1.167(a)-1(c)(1), Income Tax Regs.[12]
*166 In the instant case, the purchase price of the Holmes site was $554,423 and of the McCarty site was $1,263,293. Furthermore, the parties have stipulated that in 1976 when the dumping permits were obtained a reasonable estimate of the amount which could be realized upon a sale of the four tracts comprising the Holmes site on or about November 30, 1977 (the approximate date on which petitioner anticipated waste would cease being deposited on such tracts), was 12-1/2 percent of the cost of the tracts, or $69,303. The parties have also stipulated that in 1976 a reasonable estimate of the amount which could be realized upon a sale of the two tracts comprising the McCarty site in 1992 (the approximate date on which the petitioner anticipated waste would cease being deposited in such tracts), was 29 percent of the cost of the tracts, or $366,355. Therefore, pursuant to our opinions in Sexton and Sanders, the diminution in the value of each site or the depreciable basis of the space available at each site for the deposit of waste is computed as follows: Holmes Site
McCarty Site
Cost
$554,423
$1,263,293
Estimated Salvage Value
69,303  366,355
Diminution in value
$485,120
$ 896,938
or depreciable basis
*167 From all of the foregoing, the allowable depreciation for the tax year ending September 30, 1977 is $305,922.89 with respect to the Holmes site and $115,601.25 with respect to the McCarty site computed as follows: Holmes Site
McCarty Site
Depreciable Basis
$485,120
$896,938
Total space available in
gate yards
6,915,000
24,240,000
[13] Depreciation per gate yard $ .0701547
$ .0370023
Gate yards dumped in fiscal 1977
4,360,690
3,124,164
Depreciation for 1977
$305,922.89
$115,601.25
To reflect the foregoing and the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. For convenience, references to the subsidiary, International Disposal Corporation, will be omitted and petitioner will be referred to as the owner-operator of both landfills. ↩
2. Petitioner makes no claim that it paid any premium (any amount in excess of then current fair market value for comparable unpermitted raw/flat land) when it purchased these four tracts.↩
3. Petitioner makes no claim that it paid any premium (any amount in excess of then current fair market value for comparable unpermitted raw/flat land) when it purchased these two tracts.↩
4. One gate yard of waste is equal to one-half of a cubic yard.↩
5. SEC. 167. DEPRECIATION (a) General Rule. -- There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
6. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
7. See also Golden Gate Disposal Co. v. Commissioner,T.C. Memo. 1979-199↩.
8. The fact that dirt from the tracts was utilized as cover does not change our conclusion for the same was true of the land fill operation in Sexton,42 T.C. 1094, 1097 (1964). Nor is petitioner trying to depreciate the soil. Cf. A. Duda & Sons, Inc. v. United States,560 F.2d 669 (5th Cir. 1977). The Conference Report on the Tax Reform Act of 1986 in its discussion of useful lives under the 1986 Act contains the following: As under present law, property which the taxpayer properly elects to depreciate under the unit-of-production method or any other method not expressed in terms of years (other than the retirement-replacement-betterment method or similar method), will be so depreciated. For example, depreciation is allowable with respect to landfills on a unit basis (without regard to whether the space for dumping waste was excavated by the taxpayer), to the extent capital costs are properly allocable to the space to be filled with waste rather than to the underlying land. Conf. Report, H. Rept. No. 99-841, (1986). In the Senate's discussions of the Tax Reform Act of 1986, the following colloquy took place between Senators Bentsen and Packwood: Mr. Bentsen. I would appreciate receiving clarification on one point relating to the discussion of landfill depreciation on page 40 of the report. Although the case law is not cited, I believe it is the sense of the report that the Tax Court's decision in Sexton v. Commissioner,42 T.C. 1094 (1964) correctly applies current law to allow the recovery of capital costs to the extent such costs are properly allocable to the space to be filled with waste, rather than to the underlying land. In other words, a landfill with 10 million cubic yards of capacity with a depreciable basis of $10 million in excess of salvage value would be entitled to a deduction of $1 per cubic yard when and as filled. Is my understanding correct? Mr. Packwood. Yes. We believe the Sexton case is the applicable standard under current law, and the committee intends no change in current law. 130 Cong. Rec. S. 13952 (September 27, 1986).↩
9. While recognizing that the petitioner's dump sites cannot be put to many uses for an indeterminate period after dumping ceases because local law prohibits any construction which would perforate, crack or otherwise disturb the cap sealing each trench or mound of waste, respondent points to the fact that at least one former landfill located in Texas constituted at the date of trial a valuable location for a flea market.↩
10. Section 1.167(a)-1(b), Income Tax Regs., provides in pertinent part: (b) Useful life. For the purpose of section 167↩ the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (a) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * [Emphasis added.]
11. Section 1012 provides: The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.↩
12. Section 1.167(a)-1(c)(1), Income Tax Regs., provides in pertinent part: (c) Salvage.↩ (1) Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life. Salvage, when reduced by the cost of removal, is referred to as net salvage. The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value.
13. Depreciable basis divided by total space available in gate yards.↩